**In the Matter of DEEPHOUSE EQUIPMENT COMPANY, INC., Debtor.**

**DEEPHOUSE EQUIPMENT COMPANY, INC., Plaintiff,**

v.

**Walter J. KNAPP, Capitol City Construction Company, Inc., Defendants.**

**Bankruptcy No. 2–81–01245.
Adv. No. 2–81–0812.**

United States Bankruptcy Court, D. Connecticut.

Feb. 27, 1984.

.Julia Aurigemma of Hoberman, Pollack & Roseman, P.C., Hartford, Conn., for plaintiff.

Glen D. Morgan of Greene & Bloom, Hartford, Conn., for defendant, Walter J. Knapp.

Everett F. Fink, West Hartford, Conn., for defendant, Capitol City Const. Co., Inc.

## MEMORANDUM AND DECISION

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

The matter before the court raises issues under the Uniform Commercial Code where the decisional law, unfortunately, is not uniform. The relevant factual background which raises these issues, as disclosed in the pleadings and evidence received at trial, is as follows.

### I.

### BACKGROUND

Deephouse Equipment Company, Inc. (Deephouse) operating a business in Berlin, Connecticut, sold a tractor-loader-backhoe combination (backhoe) on December 20, 1976 at a cash price of $17,000.00 to Knapp Construction Company, Inc. (Knapp), a company located in Rocky Hill, Connecticut. The parties arranged the financing of this purchase through General Discount Corporation (General) located in Boston, Massachusetts. General prepared a conditional sales contract (contract), a U.C.C. financing statement, and a personal guarantee by Walter J. Knapp, president of Knapp. Knapp executed the documents in favor of Deephouse who then assigned them to General, with recourse. The contract called for $20,533.50 to be paid by Knapp in 36 monthly installments of $533.05 at General's office in Boston. The contract provided that it would be construed in accordance with and governed by

the laws of Massachusetts, and that "upon the occurrence of any default, Holder ... shall have the rights and remedies of a secured party under the Uniform Commercial Code of the Commonwealth of Massachusetts as amended from time to time."

On September 13, 1977, with the written consent of Deephouse and General, Knapp transferred the backhoe to Capitol City Construction Company, Inc. (Capitol). Capitol assumed the contract's unpaid balance of $18,117.76 and Walter J. Knapp agreed that his guarantee would remain in force. Sometime prior to August, 1978, Capitol defaulted in the installment payments under the contract. In May or June of 1978, Capitol had hired F & W Welding Service, Inc. (F & W) to transport the backhoe to F & W's premises in Orange, Connecticut for repairs. While at F & W, the backhoe's engine "blew a rod" and F & W disassembled the engine. Although Capitol believed F & W was responsible for the engine blowout, Capitol did not contact F & W further concerning disposition of the backhoe. Capitol was then in arrears in the monthly contract payments and did not have the funds to pay for the required extensive repairs. Furthermore, Capitol was aware that F & W had notified both Deephouse and General about the backhoe. On December 18, 1978, after demand by General that Deephouse repurchase the contract, Deephouse did so and paid to General the balance due of $10,735.52. When Deephouse arrived at F & W on January 22, 1979 to take possession of the backhoe, F & W demanded, and Deephouse paid, $866.65 for F & W's service and towing charges and its labor charge to disassemble the engine. Deephouse also paid $140.60 to F.P. Ryan to truck the backhoe from Orange, Connecticut to Deephouse's yard in Berlin, Connecticut. The inoperable backhoe with the engine dismantled has remained there ever since.

In June, 1981, Deephouse brought suit in a Connecticut state court against Capitol, and Walter J. Knapp on his guarantee, for the balance due on the contract of $10,735.52, the monies paid to F & W and Ryan to secure possession of the backhoe, legal fees and interest.[1] Although the Deephouse complaint averred that Deephouse had repossessed the backhoe, there was no reference either to its disposition or to any credit due Capitol. In their answers to the complaint, both Capitol and Walter J. Knapp admitted that the contract was in default and that they had refused to pay the monies demanded by Deephouse. By way of special defenses, they asserted that Deephouse's repossession of the backhoe, its failure to dispose of it and the length of the retention of the backhoe constituted violations of the requirements of commercial reasonableness and good faith imposed by the Uniform Commercial Code.[2]

Deephouse filed a chapter 11 petition on November 30, 1981, and shortly thereafter removed the state court action against Capitol and Walter J. Knapp to the bankruptcy court. At the trial held on May 26, 1982 and June 23, 1982, James R. Deephouse, the president of Deephouse, testified that after taking possession of the backhoe in January, 1979, he believed that the market for the backhoe, in its inoperable condition, was poor. Therefore, he did not attempt to put the backhoe up for auction. He neither advertised the backhoe for sale nor called other dealers about it. Only in the last six months prior to trial, did he put the backhoe in a used equipment list which he passed out to dealers. He stated that he retained the backhoe in the expectation that he could purchase a used or rebuilt engine to put in the backhoe to make it saleable. Because Deephouse itself was experiencing cash problems, it never had the monies available, estimated by Mr.

---

1. The contract contains a provision that after default the holder shall be reimbursed "reasonable attorneys' fees (15% of the amount sued for, if not prohibited by law)," and interest shall run at 12% per annum.

2. Both parties also asserted counterclaims arising from the retention of the backhoe for lost use of the backhoe and for the excess of collateral value over the amount of the debt. These counterclaims have not been further addressed and are deemed abandoned.

Deephouse at $3,000.00 minimum, to make these repairs. Deephouse never sent Capitol a notice that it proposed to retain the backhoe in satisfaction of the obligation. Mr. Deephouse stated, based upon casual offers he received, that the backhoe in its nonoperating condition had and has a value of $3,000.00, although he conceded he would not sell the backhoe for that amount. He testified the backhoe would be worth $10,000.00 to $12,000.00 if repaired. Aaron Cox, president of Capitol and experienced in the purchasing of construction equipment, testified that the backhoe was worth "at least $8,000.00," (transcript of June 23, 1982 at 59) in its nonoperating condition and if in operating condition would have a value of between $12,000.00 and $14,000.00. He stated the cost of repair should be $4,000.00 or less.[3]

## II.

## ISSUES

The defendants assert that Deephouse's nonaction with respect to the backhoe bars it from any recovery on the debt. They argue that a secured party who repossesses and retains collateral for an unreasonably long time impliedly elects to retain the collateral in full satisfaction of the debt the collateral secures. Alternatively, the defendants argue that even if such an election cannot be found, a secured creditor who fails to make a reasonable disposition of repossessed collateral is barred from recovery of any deficiency. Because the contract payments were to be made in Massachusetts to General which was located there and because none of the parties chal-

lenge the application of the contract clause providing that the legal issues in this proceeding be determined in accordance with the laws of Massachusetts, I will proceed on that basis.[4]

## III.

## CONCLUSIONS

### A.

### RETENTION OF COLLATERAL IN SATISFACTION OF DEBT WHERE STATUTORY NOTICE NOT SENT

Chapter 106, § 9–505(2) of the Massachusetts General Laws provides:

[A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection.

Mass.Ann.Laws ch. 106, § 9–505(2) (Law. Co-op.1983 Supp.). Courts appear to take at least three different approaches to the issue of whether or not a § 9–505(2) election can be made by a creditor where the creditor has not sent the written proposal to the debtor to retain the collateral in satisfaction of the obligation. One group of courts holds that a § 9–505(2) election can be implied from an unreasonably prolonged retention of collateral. *See Shultz v. Delaware Trust Co.*, 360 A.2d 576 (Del. Super.Ct.1976); *Bradford v. Lindsey Chevrolet Co., Inc.*, 117 Ga.App. 781, 161 S.E.2d 904 (1968); *Service Chevrolet, Inc. v. Kelley*, 99 Wash.2d 199, 660 P.2d 760 (1983). A second line of cases holds that an elec-

---

3. Upon the conclusion of the hearings, the parties advised the court that they would delay filing post-trial memoranda until after they had exhausted settlement negotiations. The post-trial memoranda were not received until January 25, 1984.

   This case was tried before *Northern Pipeline Construction Co. v. Marathon Pipe Line*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) was decided. I need not determine the limits of *Marathon's* prospectiveness as to my ability to enter a final judgment in this related proceeding because the parties have consented to the entry of a final judgment. *See* Emergency Resolution

for Administration of Bankruptcy System § (d)(3)(B).

4. "[W]hen a transaction bears a reasonable relation to this state and also to another state ... the parties may agree that the law ... of such other state ... shall govern their rights and duties." Conn.Gen.Stat.Ann. § 42a–1–105(1) (West 1969).

   Deephouse adopted Massachusetts law in its brief. Capitol pleaded Massachusetts law in its answer. Walter Knapp did not address the choice of law question at all.

tion under § 9–505(2) is impossible absent the service on the debtor of the statutory proposal to retain. *See Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077 (1975); *S.M. Flickinger Co., Inc. v. 18 Genesee Corp.,* 71 A.D.2d 382, 423 N.Y.S.2d 73 (1979). A third position requires proof that the creditor definitely manifested an intent to accept the collateral in satisfaction of the obligation. *See Nelson v. Armstrong,* 99 Idaho 422, 582 P.2d 1100 (1978); *Jones v. Morgan,* 58 Mich.App. 455, 228 N.W.2d 419 (1975); *Winters National Bank & Trust Co. v. Saker,* 66 Ohio App.2d 31, 419 N.E.2d 890 (1979). I believe from a review of the following cases that Massachusetts would be included in this third line of authority.

In *Fed. Deposit Ins. Corp. v. Air Atlantic, Inc.,* 389 Mass. 950, 452 N.E.2d 1143 (1983), a pledgee held mutual fund shares to secure certain notes. Upon default on the notes, the pledgee's successor, the Federal Deposit Insurance Corporation (F.D.I.C.), sent notice of default to the owner of the shares and in the same letter declared its intent to foreclose on the securities and sell them for the debtors' account. *Id.,* 389 Mass. at 952–53, 452 N.E.2d at 1145. In response to the owner's letter which denied the F.D.I.C.'s right to possess the shares, the F.D.I.C. reiterated its demands for payment and declared the "collateral will now be redeemed and the proceeds applied against the debtors." *Id.,* 389 Mass. at 953, 452 N.E.2d at 1145. Five years later, the F.D.I.C. sold the shares. *Id.* When the F.D.I.C. sued on the notes, the defendants argued that the F.D.I.C. had impliedly retained the collateral in full payment of the notes based on the F.D.I.C.'s retention of the securities in a declining market and also sought damages for that unreasonable retention. *Id.,* 389 Mass. at 956–57, 452 N.E.2d at 1147. The court first rejected the debtors' argument that the F.D.I.C.'s retention of the collateral in a declining market was commercially unreasonable, refusing to shift the investment risk on the pledged securities from the borrower to the lender. *Id.* The court then rejected the debtors' argument that by its commercially unreasonable retention of the collateral the F.D.I.C. had made a § 9–505(2) election, saying, "We make no attempt to state all the reasons for rejecting the [debtors'] reasoning. It is sufficient to note that [debtors'] ... assertion is but a variation of the argument that retention of the collateral was 'commercially unreasonable' ...." *Id.,* 389 Mass. at 957–58, 452 N.E.2d at 1147.

In *Haufler v. Ardinger,* 28 U.C.C.Rep. Serv. 893 (Mass.Dist.Ct.1979) (Appellate Division), the creditor repossessed the collateral, business equipment, and used it in the operation of his own business for thirty-eight months, sued on the debt and subsequently sold the collateral at public auction. The debtor alleged that the creditor had impliedly retained the collateral under § 9–505(2). The trial court granted the debtor summary judgment on that theory and the Appellate Division affirmed, noting "[T]he trial court properly entered summary judgment for the defendant based upon a sound construction of ... § 9–505(2), and its application to the facts of this case." *Id.* at 896–97.

◼ Thus, in *Fed. Deposit Ins. Corp. v. Air Atlantic, Inc.,* the debtor made no affirmative showing that the creditor intended to retain the collateral in full satisfaction and, despite the five-year retention of collateral by the debtor, no § 9–505(2) election was found. In *Haufler,* however, the creditor turned the equipment to his own use, conduct inconsistent with the debtor's ownership of the collateral, and a § 9–505(2) election was inferred. Finally, it has long been settled in Massachusetts that when a creditor takes possession of property which secures a debt and the debtor subsequently pleads that act as an accord and satisfaction, the debtor must prove that the debt was intended to be discharged. *Howe v. Mackay,* 22 Mass. (5 Pick.) 44, 49–50 (1827).

◼ Assuming, therefore, that an implied § 9–505(2) election is possible, I conclude that defendants did not establish that

Deephouse intended to retain the backhoe in full satisfaction of its debt. On the contrary, the testimony showed that Deephouse retained the collateral not in full satisfaction but in the vain hope that it might secure the funds to repair the backhoe and sell it for Capitol's account. While I think Deephouse "has come perilously close to painting [itself] into a corner in this regard," *Harris v. Bower,* 266 Md. 579, 588, 295 A.2d 870, 874, (1972), I cannot say, under these circumstances, that what it has done establishes an accord and satisfaction, statutory or otherwise.[5]

### B.

### THE EFFECT OF ACTING IN A COMMERCIALLY UNREASONABLE MANNER ON DEBT COLLECTION

■ Chapter 106, § 9–504 of the Massachusetts General Laws provides:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

(2) If the security interest secures an indebtedness, . . . unless otherwise agreed, the debtor is liable for any deficiency. . . .

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

Mass.Ann.Laws ch. 106, § 9–504 (Law.Co-op.1983 Supp.). A commercially unreasonable nondisposition of collateral by the se-

cured party has the same effect on the noncomplying creditor's right to recover on its debt as a disposition which does not satisfy Part 5 of Art. 9, U.C.C. § 9–501 et seq. *See, e.g., Chapman v. Martin,* 124 Ariz. 100, 602 P.2d 481 (1979); *Farmers State Bank of Parkston v. Otten,* 87 S.D. 161, 204 N.W.2d 178 (1973). Two issues, therefore, must be resolved. The first issue is the threshold question of whether or not Deephouse's conduct concerning its retention of the collateral was commercially unreasonable. The second issue is, if Deephouse did behave in a commercially unreasonable manner, what is the effect of Deephouse's behavior on its right to recover on the debt?

■ I find that Deephouse did not act in a commercially reasonable way in the length and manner of its retention of the collateral. Deephouse had held the backhoe for over three years at the time of trial. During those three years, Deephouse made no serious efforts to dispose of the backhoe as it stood (with its engine removed) because Deephouse believed the backhoe would not sell in that condition. At some point during that period, Deephouse should have realized that its hopes of repairing the backhoe were unrealistic and made some disposition of the backhoe. This is not to say a secured creditor must rush to sell collateral and is precluded from making feasible repairs which would enhance the net value of the collateral; the Code itself allows for "commercially reasonable preparation," Mass.Ann.Laws ch. 106, § 9–504(1) (Law.Co-op.1983 Supp.), before sale. However, under these circumstances, Deephouse's retention of the backhoe past the time when it should have realized presale preparation was not feasible was commercially unreasonable.[6]

---

**5.** A Massachusetts case has sometimes been cited for the principle that without the statutory notice, no election can be implied. *See Priggen Steel Buildings Company v. Parsons,* 350 Mass. 62, 213 N.E.2d 252 (1966). Because of my conclusion on the facts, even if *Priggen* represents Massachusetts law, there would be no different result in this proceeding.

**6.** I am aware that the party who must bear the burden of proof on the issue of commercial reasonableness may change with the theory adopted on the issue of the effect of the creditor's misbehavior on its right to recover on its debt. *See* Annot., 59 A.L.R.3d 369, 375–76 (1974). It is unnecessary to address this issue, however, since I would be persuaded that Deephouse's retention of the backhoe was unreason-

Having decided that Deephouse's prolonged retention of the backhoe was not commercially reasonable, it remains to be decided what effect Deephouse's conduct has on its right to recover on its debt. The cases which deal with the effect of commercially unreasonable behavior on the creditor's right to recover on its debt fall into three groups. One line of cases holds that strict compliance with Part 5 of Article 9, U.C.C. § 9–501 et seq., is a condition precedent to the recovery of any collateral deficiency. *See, e.g., Wilmington Trust Co. v. Conner,* 415 A.2d 773 (Del.1980); *Twin Bridges Truck City, Inc. v. Halling,* 205 · N.W.2d 736 (Iowa 1973); *Jackson State Bank v. Beck,* 577 P.2d 168 (Wy. 1978). A second line of cases holds that the noncomplying creditor does not lose the right to recover any deficiency but must overcome the presumption that the value of the collateral equals the amount of the debt. *See, e.g., Dischner v. United Bank Alaska,* 631 P.2d 107 (Alaska 1981); *Universal C.I.T. Credit Co. v. Rone,* 248 Ark. 665, 453 S.W.2d 37 (1970); *Associates Capital Services Corp. v. Riccardi,* 408 A.2d 930 (R.I.1979). The third line of cases also eschews a forfeiture, relies on the express remedy of § 9–507[7] for debtor relief from creditor misbehavior and allows the debtor a set-off for any loss which the debtor can show he suffered. *See, e.g., Chapman v. Martin, supra; Walker v. V.M. Box Motor Co., Inc.,* 325 So.2d 905 (Miss.1976); *Beneficial Finance Co. v. Young,* 612 P.2d 1357 (Okl.1980).

*Poti Holding Co., Inc. v. Piggott,* 15 Mass.App. 275, 444 N.E.2d 1311 (1983), is indicative of the trend away from enforcing a forfeiture against the creditor who fails to comply with statutory provisions.

The Code does not require automatic forfeiture. Specific remedies are provided in GL c 106, § 9–507(1), against a secured creditor who, among other misdeeds, fails to sell collateral in a commercially reasonable manner. A debtor may restrain an improper sale and also "has a right to recover from the secured party any loss caused by [the] failure to comply" with the Code. There is no mention of a forfeiture of the right to a deficiency and, in addition, GL c 106, § 1–106, states that the Code remedies are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this chapter or by other rule of law."

In view of the specific remedies provided by GL c 106, § 9–507(1) ... and the explicit statement in GL c 106, § 1–106, against penalties, "[w]e are unwilling to assume that the Legislature intended to effect such a forfeiture of private contractual rights."

*Poti Holding Co., Inc. v. Piggott,* 15 Mass. App. at 279–80, 444 N.E.2d at 1314 (citation omitted).

■ I am satisfied that the above-quoted statements from *Poti Holding Co.* accurately reflect the Massachusetts rule on this issue which is that the noncomplying creditor may still recover on its debt subject to the debtor's § 9–507(1) set-off or counterclaim. I credit the testimony of Mr. Cox that the backhoe was worth $8,000.00 with the engine removed and that a commercially reasonable disposition would have brought that amount. I conclude that the defendants are entitled to an $8,000.00 set-off against Deephouse's recovery on the debt.

---

able even if the defendants were to bear the risk of nonpersuasion on this issue.

7. Chapter 106, § 9–507(1) of the Massachusetts General Laws provides:

If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification ... has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part.

Mass.Ann.Laws ch. 106, § 9–507(1) (Law.Co-op. 1983 Supp.).

For the reasons discussed above, I find for Deephouse on its claims against Capitol and Walter Knapp as follows:

$2,735.52 on the contract debt ($10,735.52 subject to an $8,000.00 set-off in favor of Capitol and Walter Knapp); $866.65 paid to recover the backhoe from F & W; $140.60 paid to F.P. Ryan to transport the backhoe to Deephouse's premises; interest on $2,735.52 at the contractual rate of 12% per annum from the date of Deephouse's repurchase of the contract (December 18, 1978) to the date of judgment of $1,705.17 and attorney's fees of $817.19 (15% on a base of $5,447.94), for a total of $6,265.13.

This Memorandum shall constitute the Findings of Fact and Conclusions of Law mandated by Rule 7052, Fed.R.Bankr.P.