**In re IPSWICH BITUMINOUS CONCRETE PRODUCTS, INC., Debtor.**

**Harold P. MURPHY, Trustee, Plaintiff,**

**v.**

**Brian Jeffrey ROBINSON, Rita Robinson, Trustee of Ipsbit Realty Trust and Individually John Cavatorta, Alfred Aponas, Ipswich Savings Bank, Colonial Bank, Fairfield Group, Ltd., Spruce Mountain Development Corporation, and Samian Home Builders, Inc., Defendants.**

**Bankruptcy No. 86–10148–JNG. Adv. No. 86–1169.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 18, 1988.

Joan N. Feeney, Hanify & King, Boston, Mass., for plaintiff.

William Sheehan, Pearl, McNiff, Crean, Cook & Sheehan, Peabody, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### INTRODUCTION

On November 2, 1987, 79 B.R. 511, this Court entered judgments with respect to Counts 4, 5, 7, 8, 9, 10, 16, 17, 18, 20, 22, and 26 of the Trustee's 29 count complaint against two of the above named nine defendants, namely John Cavatorta and Alfred Aponas. Additionally, in the opinion that accompanied those judgments, the Court explained the disposition of Counts 1, 2, 3, 6, 11, 12, 13, 14, 15, 19, 21, 23, 24, 25, and 27 against Rita Robinson, individually and as Trustee of Ipsbit Realty Trust, Brian J. Robinson ("Robinson"), the Ipswich Savings Bank, the Fairfield Group Ltd. ("Fairfield") and the Colonial Bank. The remaining two counts, Counts 28 and 29, are now before the Court. However, Counts 21, 24 and 27 must be considered to fully understand Count 28 against Samian Home Builders, Inc. ("Samian") and Count

29 against Spruce Mountain Development Corp. ("Spruce" or "Spruce Mountain").

In Counts 21 and 27 the Trustee, pursuant to 11 U.S.C. § 548 (West 1987), alleges that Fairfield, received a fraudulent transfer of the Debtor's rights to property in New Hampshire. Through Count 24, the Trustee seeks to reach and apply Robinson's shares of stock in Fairfield. In Counts 28 and 29, the Trustee, pursuant to 11 U.S.C. § 550 (West 1987), seeks to recover from Samian and Spruce Mountain as either immediate or mediate transferees of Fairfield the value of the Debtor's interest in the New Hampshire property. Samian and Spruce Mountain filed an answer in which they deny the material allegations of Counts 28 and 29 and assert affirmative defenses. The Court heard the Trustee's case against Samian and Spruce Mountain on February 24, 1987 and June 23, 1987.

As was explained in the earlier opinion, the Trustee obtained a default judgment against Fairfield on October 24, 1986 and entered into a Stipulation for Judgment with Robinson on February 24, 1987. That stipulation has yet to be approved by the Court.[1] In pertinent part, the Stipulation contemplates the assignment by Robinson to the Trustee of his stock in Fairfield and all his rights, claims and causes of action against Fairfield, its shareholders, officers and directors, the New Hampshire property, Samian and Spruce Mountain. The Stipulation, as will become clear, is integral to the Trustee's attempt to recover from Samian and Spruce Mountain.

## FACTS

The facts, though complicated, are not disputed seriously. As this Court found in its earlier opinion, and as was established by the Trustee in the instant proceeding, the Debtor was incorporated as a Massachusetts corporation on March 27, 1984. Its stated purpose was to purchase, sell, and install bituminous concrete products

and to carry on "any business permitted by the laws of the Commonwealth." Robinson, Alfred Aponas ("Aponas") and John Cavatorta ("Cavatorta") were officers and directors, and each held one third of the outstanding shares of common stock. On April 4, 1984, the principals of the Debtor purchased the assets of a concrete business from James Brady for $410,000, using borrowed funds. The Debtor commenced operations immediately. Robinson, the president, was responsible for handling the books, preparing bids on construction projects and collecting accounts receivable. Aponas, the vice-president, and Cavatorta, the treasurer, were responsible for work in the field.

In the late summer or fall of 1984, Robinson, Cavatorta and Aponas met with David Stern, the Debtor's clerk and corporate attorney, to discuss corporate activities during the Debtor's slow season, the period between December and April when weather conditions prevented the Debtor from undertaking extensive paving work. During those discussions, Robinson broached the possibility of purchasing development property in New Hampshire. Indeed, he testified that he took Aponas and Cavatorta to New Hampshire on several occasions to inspect parcels of land there. In October of 1984, Robinson, Cavatorta and Aponas decided to buy the Spruce Mountain property, a 146 acre parcel of land on Carter Notch Road in Jackson, New Hampshire. The land was and still is undeveloped except for a rustic resort lodge and three log cabins. Robinson, Cavatorta and Aponas intended a corporation to be known as the Fairfield Group to take title to the Spruce Mountain property and oversee its development as a resort and condominium complex. However, on October 18, 1984, Robinson, on behalf of the Debtor, not Fairfield, executed a purchase and sale agreement with Henry Jablecki and others. The agreement provided for a purchase

---

1. George Brox, Inc. and Brox Paving Materials, Inc. ("Brox"), allegedly the Debtor's largest unsecured creditors, oppose the Stipulation for Judgment on the grounds that it is a compromise that must be submitted to the Court by way of motion and noticed out to creditors in accordance with Bankruptcy Rule 9019(a). Brox asks the Court to defer action on the Stipulation and to order the Trustee to file a motion for the approval of the compromise with Robinson.

price of $300,000 and a deposit of $25,000. The Debtor paid the $25,000 deposit in two installments. The deposit was held by Griebbel, Wason & Jones, a real estate brokerage firm in North Conway, New Hampshire.

The sales agreement contained a provision concerning liquidated damages. Specifically, the agreement provided: "If the BUYER shall default in the performance of his obligation under this agreement, the amount of the deposit may, at the option of the SELLER, become the property of the SELLER as reasonable liquidated damages." In an addendum to the sales agreement, the Debtor and the sellers agreed that the sale was subject to five conditions: 1) the Debtor's ability to obtain bank financing in the amount of $175,000; 2) the sellers' agreement to provide secondary financing for $50,000; 3) the Debtor's ability to obtain a construction loan for 25 dwellings and a new lodge; 4) the Debtor's ability to obtain, at its sole expense, State Water Pollution and Control Commission and Town of Jackson Planning Board approvals for the construction and operation of 50 dwelling units and a 30 bedroom lodge; and 5) the parties' ability to close within 30 days of the granting of all state, local and bank approvals or by April 1, 1985.

The Debtor engaged the services of an achitect, an engineer and several attorneys and disbursed substantial sums for materials in an effort to prepare the site and obtain necessary zoning board approvals. However, even after the expenditure of $26,242.08, the Debtor was unable to obtain the requisite governmental approvals and permits. Nevertheless, Robinson was determined to proceed with the sale and, as president of the Debtor, extended the purchase and sale agreement on February 11, 1985 until May 1, 1985, on May 29, 1985 until August 15, 1985, and on July 19, 1985 until September 15, 1985. Robinson obtained the extensions in the absence of corporate votes in favor of the them. Furthermore, he obtained the July extension at a time when he knew Cavatorta and Aponas were no longer in favor of purchasing the New Hampshire property.

In late August of 1985, Robinson contacted Mike and Chris Stasinos, father and son real estate developers, for whom the Debtor had performed paving work. Robinson testified that he told both Chris and Mike Stasinos about the deposit and development expenditures and gave them, or at least Mike Stasinos, a development package containing the sales agreement that named the Debtor as the buyer of the Spruce Mountain property. Mike and Chris Stasinos eventually agreed to participate in the purchase and development of the property. Additionally, they agreed that the $175,000 in financing necessary to purchase the property would be secured by a first mortgage on the property and that a New Hampshire corporation would be formed to take title to the property. Accordingly, Chris Stasinos, Mike Stasinos and Robinson retained Peter G. Hastings, an attorney from Fryeburg, Maine, to incorporate Fairfield as a New Hampshire corporation. Each received one-third of the outstanding shares of Fairfield when it was formed on September 11, 1985 to take title to the Spruce Mountain property. The three stockholders constituted the board of directors of Fairfield. Robinson was president; Mike Stasinos was treasurer.

The Stasinos' also engaged the services of a Salem, Massachusetts attorney, George P. Vallis. They gave him a copy of the sales agreement for the New Hampshire property and instructed him to examine the record title to Robinson's home, as Robinson also had discussed borrowing substantial sums of money from Mike Stasinos. Attorney Vallis discovered that Robinson had insufficient equity in his personal residence to secure the loan. Nevertheless, on September 13, 1985, Robinson executed a promissory note for $50,000 to Mike Stasinos in which he waived notice, demand and protest. The note was payable in two years, at an annual rate of interest of 18%, with monthly interest payable in the amount of $750 on the 13th of each month. On the same day, Robinson assigned all his shares in Fairfield to Mike Stasinos as security for the note, although the parties did not note the assignment on

the reverse side of Robinsons' stock certificate. Mike Stasinos, or Attorney Vallis, took possession of Robinson's stock certificate for 500 shares of Fairfield and the stock assignment. Attorney Vallis presented Robinson with a check made payable to the Boston law firm of Brown, Rudnick, Freed and Gesmer in the amount of $50,000, having previously obtained that sum from Mike Stasinos. Robinson subsequently asked Vallis for a replacement check which he had certified and then used to redeem the stock held by Cavatorta and Aponas in the Debtor.

On September 17, 1985, two days after the third extension of the purchase and sale agreement expired, Fairfield purchased the Spruce Mountain property at a closing that took place in Ossipee, New Hampshire. The Debtor's $25,000 deposit was not refunded, nor was it retained by Jablecki as liquidated damages. Rather, it was applied to the purchase price. The balance of the $300,000 price, $275,000, was paid from three sources: 1) the proceeds of a $175,000 loan to Fairfield from Mike Stasinos as Trustee of the South Trust secured by a first mortgage on the property; 2) the proceeds from a $50,000 loan to Fairfield from Jablecki secured by a second mortgage on the property; and 3) two cash contributions, each in the amount of $25,000, made by Mike and Chris Stasinos.

After the closing on the Spruce Mountain property, Robinson failed to make payments under the terms of the $50,000 note to Mike Stasinos and was in default. On December 17, 1985, Robinson, on the advice of Attorney David Stern, wrote to Mike Stasinos. In the letter, Robinson recognized that he was personally obligated to Mike Stasinos for three payments of $750 under the $50,000 note and that he owed in excess of $2,700 for his share of Fairfield's mortgage obligations to the South Trust and Jablecki, for a total amount due of $4,981.71. However, Robinson asserted that Stasinos Corp., an entity presumably owned and controlled by Mike Stasinos, owed Ipswich Bituminous $12,240. Accordingly, Robinson proposed an offset of the two amounts.

Mike Stasinos was not receptive to Robinsons' proposal. He was in contact with Attorney Vallis and was proposing to default Robinson on the note and transfer the Jackson property from Fairfield to the South Trust. After several unsuccessful attempts by Attorney Vallis and Mike Stasinos to reach Robinson by phone, Mike Stasinos and Chris Stasinos met with Attorney Vallis. At the meeting that took place an March 12, 1986, Mike Stasinos attempted to enforce his security interest in Robinson's 500 shares of Fairfield stock. At the same time, the Stasinos' approved the conveyance of the Spruce Mountain property from Fairfield to Samian, a Massachusetts corporation owned and controlled by Mike and Chris Stasinos. The property was conveyed subject to the first and second mortgages which Samian agreed to pay.

The March 12, 1986 meeting purported to be a meeting of the shareholders and directors of Fairfield. However, neither Attorney Vallis nor Mike Stasinos succeeded in giving Robinson oral or written notice of the meeting, and Robinson testified that he was unaware of the meeting. Additionally, Robinson was not officially removed as an officer or director of Fairfield.

In the spring of 1986, Mike Stasinos, on behalf of Samian, applied to Essexbank for a construction loan in the amount of $400,000. At the time, he informed the bank that he intended to construct 50 condominiums on the property once the necessary approvals were obtained. Although the bank did not obtain an appraisal of the property, it approved the loan, arbitrarily determining that the property had a potential value of approximately $750,000 based upon a formula of $15,000 per permit per unit. On May 22, 1986, Samian executed a mortgage to Essexbank, and Essexbank disbursed $333,573.74 to Samian. After the payment of the first and second mortgages, taxes and attorneys' fees, Samian received $145,784.10 in loan proceeds.

On July 2, 1986, the Spruce Mountain property was conveyed again, this time to Spruce Mountain Development Corp., the present owner of the property. Spruce had been incorporated by Attorney Vallis as a

Massachusetts corporation. James N. and William N. Katsapetses were named president and treasurer, respectively. They own two-thirds of the stock; Mike Stasinos owns the remaining shares. The sole consideration for the transfer of the property from Samian to Spruce Mountain was the assumption of the Essexbank mortgage. On the same day as the conveyance, the Katsepetses' executed a second mortgage in favor of the South Trust to secure the payment of a note from Spruce to the trust in the amount of $132,000. At the time of the conveyance and at the time of trial, the Town of Jackson zoning board still had not granted subdivision approvals for the Spruce Mountain property.

The Trustee, through Robinson, introduced evidence of the Debtor's insolvency in September of 1985 and thereafter. That testimony was unrebutted. Beside the fact that Fairfield paid $300,000 for the property, there was little evidence as to the value of the Jackson property. Robinson expressed an opinion, unsupported by other testimony, that the property was worth $500,000 "as is" in September of 1985. Mike Stasinos expressed the opinion that the property was worth $750,000 in April of 1986 with zoning board approval. Notably, Chris and Mike Stasinos testified about problems associated with obtaining zoning board approvals and proceeding with the development of the Spruce Mountain parcel.

### DISCUSSION

The Trustee, in his brief, makes two distinct arguments. His first argument is predicated upon sections 548 and 550 of the Bankruptcy Code. His second argument is predicated on the Stipulation for Judgment.

### I

Section 550 of the Bankruptcy Code provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or,

if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

(c) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

11 U.S.C. § 550(a)–(c) (West 1987). Application of section 550 in the context of this proceeding, as both parties recognize, requires an examination of the Trustee's fraudulent conveyance claim against Fairfield.

Section 548(a)(1) permits the trustee to avoid any voluntary or involuntary transfer of a debtor's interest in property made by a debtor with actual intent to defraud creditors. Section 548(a)(2) sets forth a constructive fraud standard. It permits the trustee to avoid such a transfer if a debtor receives less than a reasonably equivalent value in exchange for the transferred interest and the debtor is insolvent or rendered insolvent by the transfer. 11 U.S.C. § 548(a) (West 1987).

Since the Bankruptcy Code does not define what constitutes an interest in property, the existence of a debtor's interest in property is determined by nonbankruptcy law, *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Moreover, the law of the state in which the property is located governs questions of property rights, *Johnson v. First National Bank of Montevideo, Minn.*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Accordingly, New Hampshire law applies to the determination

of the Debtor's interest in the Spruce Mountain property.

Indeed, the critical issue in this case is whether the Debtor had an interest in the Spruce Mountain property. If the Debtor had no interest in the property, an essential element of a claim under section 548 would be missing and further discussion of the Trustee's argument under sections 548 and 550 would be pointless. Although it is undisputed that the $25,000 deposit came from the Debtor's funds, Samian and Spruce, on the one hand, assert that the Debtor had no interest in the property for two reasons: 1) the extension of the Debtor's purchase and sale agreement expired two days before the closing at which Fairfield purchased the property; and 2) Robinson was not authorized to extend the purchase and sale agreement on behalf of the Debtor. The Trustee, on the other hand, makes three points: 1) the expiration of the third extension was of no consequence since a party who performs under an agreement is deemed to have waived any breeches of that agreement; 2) Robinson, as president of the Debtor, had authority to extend the time for performance under the sales agreement; and 3) at the time of the closing, the Debtor was authorized to transfer the Debtor's "right" to purchase the Spruce Mountain property to Fairfield, since Cavatorta and Aponas had resigned as officers and directors of the Debtor at the time their shares were redeemed.

The Court concludes that the Debtor had no interest in the Spruce Mountain property. Because of the expiration of the third and final extension of the sales agreement and the various conditions contained in it, the sales contract was neither binding nor specifically enforceable by the Debtor or Jablecki. Accordingly, the Debtor, on September 17, 1985, had no right to buy the property that could be considered an interest in property capable of being transferred to Fairfield. The fact that Jablecki and Fairfield closed on the Debtor's purchase and sale agreement does not create an interest where none existed. Accordingly, the Court need not consider the remaining elements of a cause of action under sec-

tions 548(a)(1) or (a)(2), and the parties' arguments with respect to Robinson's authority to bind the Debtor.

The Court's decision is consistent with the application of the doctrine of equitable conversion by New Hampshire courts. The Supreme Court of New Hampshire has stated that

> [u]nder this doctrine, an executory contract for the sale of land ordinarily effects a conversion of the vendor's interest in personal property and of the vendee's interest into real property. From the time the conversion occurs, the purchaser is regarded as the equitable owner of the land and the seller is regarded as the equitable owner of the purchase money. ⁵
>
>     \*    \*    \*    \*    \*    \*
>
> An equitable conversion does not occur, however, unless and until the contract for the sale of the land becomes binding upon and specifically enforceable by the parties.

*In re Jesseman's Estate*, 121 N.H. 313, 315, 429 A.2d 1036 (1981) (citations omitted).

Clearly, under New Hampshire law, the Debtor did not obtain an equitable interest in the Jackson property at the time it executed the sales agreement and deposited $25,000 with Greibbel, Wason & Jones. Moreover, the Debtor's right to buy the property for the stated purchase price expired when the third extension expired on September 15, 1985. Since the Debtor could not have compelled Jablecki to perform under the sales agreement after September 15, 1985, the Debtor's assignment of its "right" to purchase the property after that date cannot be considered an interest in property with any material value.

## II

As a result of the Stipulation for Judgment, the Trustee also submits that Mike Stasinos is not the owner of Robinson's 500 shares in Fairfield and that, pursuant to his agreement with Robinson, the bankruptcy estate is the actual owner of the shares

and, concomitantly, a one-third owner of the Jackson property. Accordingly, the Trustee asserts that he is entitled to recover 1) a one-third interest in the Jackson property; 2) one-third of the cash appropriated by the Stasinos' in April 1986 as a result of the Essexbank refinancing arrangements; and 3) all the expenses paid by the Debtor in connection with the property. Samian and Spruce Mountain respond to the Trustee's argument with the observation that as an unsatisfied judicial lien creditor, *see* 11 U.S.C. § 544(a) (West 1987), the Trustee's attempt to recover Robinson's stock is unavailing due to Mike Stasinos' prior perfected security interest in it.[2]

The parties do not dispute the fact that Articles 8 and 9 of the Uniform Commercial Code apply to security instruments, such as stock. The Draftsmen's Statement to section 8-321(2) of the Uniform Commercial Code succinctly provides that "when value has been given and the debtor has rights in the collateral, an appropriate transfer will result not only in an enforceable security interest but also in one that is perfected." *See* Draftsmen's Statement of Reasons for 1977 Changes in Official Text of U.C.C. § 8-321. *See* N.H.Rev.Stat.Ann. 382-A:8-321 (1961 & Supp.1987); *see also* N.H.Rev.Stat.Ann. 382-A:8-102(1) and 8-302(1) (1961 & Supp.1987). The Trustee correctly observes that a secured party must proceed to realize on its collateral in a commercially reasonable manner. N.H. Rev.Stat.Ann. 382-A:9-502(2) (1961 & Supp.1987). A secured party, after default under a promissory note, may elect to sell, lease or otherwise dispose of any or all of the collateral pursuant to section 9-504 of the Uniform Commercial Code, or it may elect to retain the collateral in satisfaction of the obligation pursuant to section 9-505(2) of the Uniform Commercial Code.

*See* N.H.Rev.Stat.Ann. 382-A:9-504 and 9-505(2) (1961 & Supp.1987). If the secured party proceeds under section 9-504, it must proceed in a commercially reasonable manner with respect to "every aspect of the disposition including the method, manner, time, place and terms" of the sale. N.H. Rev.Stat.Ann. at 382-A:9-504(3). Additionally, [u]nless collateral is perishable ... reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor...." *Id.* If the secured party in possession after default proposes to retain the collateral in satisfaction of the obligation, it must give written notice of such proposal to the debtor. "If the debtor or other person entitled to receive notification objects in writing within thirty days from the receipt of the notification ... the secured party must dispose of the collateral under Section 9-504." N.H.Rev.Stat. Ann. 382-A:9-505(2) (1961 & Supp.1987). Pursuant to section 9-506 of New Hampshire's version of the Uniform Commercial Code, the debtor, unless otherwise agreed in writing after default, may redeem the collateral. N.H.Rev.Stat.Ann. 382-A:9-506 (1961 & Supp.1987). Furthermore, section 9-507 governs the secured party's liability for failure to comply with the preceding sections. It provides in relevant part:

1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a

---

**2.** Samian and Spruce also object to the Trustee's position on the grounds that this theory was not pleaded by the Trustee. However, Samian and Spruce were put on notice of the Trustee's position by virtue of the arguments made by the Trustee in his pre-trial memorandum which was filed on February 20, 1987. Since Samian and Spruce were served with a copy of that memo and address the Trustee's arguments in their

post-trial brief, the Court finds that they are not prejudiced by the consideration of the Trustee's position. *See generally* Bankruptcy Rule 7015 and Fed.R.Civ.P. 15(b). Additionally, the Court finds that the Trustee may rely on the stipulation despite the opposition to the stipulation by Brox because Brox raises only procedural points in its objection.

failure to comply with the provisions of the Part. N.H.Rev.Stat.Ann. 382–A:9–507(1) (1961 & Supp.1987). Finally, the debtor's rights to notice and to object to the retention of the collateral cannot be waived. N.H.Rev.Stat. Ann. 382–A:9–501(3) (1961 & Supp.1987).

A cursory review of the facts clearly warrants the conclusion that Mike Stasinos failed to comply with even the most rudimentary requirements of the Uniform Commercial Code with respect to his attempt to exercise Robinson's stock pledge. However, Samian and Spruce suggest that the evidence does not warrant such a finding, and, moreover, any noncompliance by Mike Stasinos does not invalidate his foreclosure of Robinson's rights in the security.

As Judge Krechevsky noted in *In re Deephouse Equipment Co., Inc.*, 38 B.R. 400 (Bankr.D.Conn.1984),

> Courts appear to take at least three different approaches to the issue of whether or not a § 9–505(2) election can be made by a creditor where the creditor has not sent the written proposal to the debtor to retain the collateral in satisfaction of the obligation. One group of courts holds that a § 9–505(2) election can be implied from an unreasonably prolonged retention of collateral. A second line of cases holds that an election under § 9–505(2) is impossible absent the service on the debtor of the statutory proposal to retain. A third position requires proof that the creditor definitely manifested an intent to accept the collateral in satisfaction of the obligation. I believe ... Massachusetts would be included in this third line of authority.

38 B.R. at 403–04 (citations omitted). Neither the Trustee nor the defendants, Samian and Spruce Mountain, address the issue of whether New Hampshire or Massachusetts law applies, although Samian and Spruce cite Massachusetts statutory and case law, and the Trustee cites New Hampshire law. The Court has been unable to find any New Hampshire cases adopting one of the approaches identified by Judge Krechevsky or even suggesting the approach that likely would be adopted by New Hampshire courts. Accordingly, for the purpose of the opinion only and because Robinson and Mike Stasinos are both Massachusetts residents, the stock pledge transaction took place in Massachusetts, and the Massachusetts and New Hampshire statutory schemes for the relevant provisions of the Uniform Commercial Code are nearly identical, the Court will be guided by Massachusetts law.

The Court is convinced that Samian and Spruce introduced sufficient evidence to support a finding that Mike Stasinos definitely manifested an intent to accept the collateral in satisfaction of the $50,000 loan to Robinson. Unlike the situation in *In re Deephouse Co., Inc.*, there was no indication that Mike Stasinos intended to try to sell the stock at a later time for an amount equal to or in excess of the loan obligation or to sue Robinson for any deficiency. More importantly, the Court recognizes that a contrary holding would obligate the Trustee to Mike Stasinos under the stock pledge pursuant to his Stipulation for Judgment with Robinson, although the Trustee possibly would have rights against Stasinos under the Uniform Commercial Code, *see* N.H.Rev.Stat.Ann. 382–A:9–507(1), and under the New Hampshire Business Corporation Act, *see, e.g.,* N.H.Rev.Stat.Ann. 293–A:81 (1987 & Supp.1988), with respect to the right of shareholders to dissent and obtain payment for their shares. The Court also notes that even if it were to rule in the Trustee's favor on this issue, there is insufficient evidence in the record from which the Court could fashion an appropriate judgment pursuant to the two statutory provisions mentioned that would inure to the benefit of the estate.

As the Court has noted, other than the purchase price, there was a paucity of reliable and convincing evidence as to the value of the Jackson property. Using the $300,000 purchase price as the best evidence of the fair market value of the property and discounting the Essexbank and South Trust mortgages, Fairfield had $75,000 in equity in the property prior to its transfer to Samian. Accordingly, Robinson's one-third interest in Fairfield would be worth $25,000 at best, but he would still

be liable to Mike Stasinos in the amount of $50,000. Assuming the Court ordered the return of the property to Fairfield, the property would have to have a value in excess of the Essexbank mortgage of $400,000, the South Trust mortgage of $132,000 and the stock pledge of $50,000 before the Trustee, standing in Robinson's shoes, would have anything to gain for the estate.

■ The Trustee also asserts, and the Court agrees, that the Stasinos' failed to comply with the provisions of the New Hampshire Business Corporation Act, N.H. Rev.Stat.Ann. 293–A:1–170 (1987 & Supp. 1988), with respect to notice of the special meeting of the shareholders and directors of Fairfield that took place on March 22, 1986. Section 80 of the New Hampshire Business Corporation Act provides that the sale, lease, exchange or other disposition of property, in this case Fairfield's only asset —the Jackson property, out of the ordinary course of business may be authorized in one of two ways: 1) by the board of directors pursuant to a resolution recommending the sale or 2) by written notice to shareholders of an annual or special meeting to consider the proposal followed by a majority vote of the shareholders entitled to vote. N.H Rev.Stat.Ann. 293–A:80 (1987 & Supp.1988). These requirements simply were not met. Accordingly, the action taken at the meeting, namely the transfer of the Jackson property, was improper.

The Trustee suggests that the imposition of a constructive trust is an appropriate equitable remedy in lieu of an order requiring the return of the Jackson property to Fairfield. The Court agrees that such a remedy may be appropriate in some circumstances. However, the Court regrettably is unable to fathom how the Trustee based upon either Robinson's ownership interest in Fairfield or a return of the property to Fairfield, can maintain a right to a constructive trust on or the return of the value of a one-third interest in the Jackson property, a one-third interest in the refinancing proceeds, i.e., $48,594.70, in addition to the $25,000 deposit and the $26,242.08 in development expenditures. For example, a one-third interest in the property necessarily would obligate the Trustee to make one-third of the mortgage payments to Essexbank and the South Trust. Likewise, unless the Trustee would be willing to assume some responsibility for the repayment of the Essexbank loan, the Court does not believe the Trustee would be entitled to one-third of the cash proceeds from the Essexbank refinancing. To the extent the Trustee would be entitled to one-third of the equity in the Jackson property, assuming Robinson remained the owner of the Fairfield stock, the Trustee failed to introduce persuasive evidence as to the value of the property after its initial transfer from Jablecki to Fairfield.

■ The Trustee's position with respect to the $25,000 deposit and the development expenditures paid for by the Debtor is far more persuasive. New Hampshire courts hold that:

> '[i]n the absence of a contractual agreement, a trial court may require an individual to make restitution for unjust enrichment if he has received a benefit which would be unconscionable to retain'. The trial court must determine whether the facts and equities of a particular case warrant such a remedy.

*Iacomini v. Liberty Mutual Insurance Co.*, 127 N.H. 73, 78, 497 A.2d 854 (1985) (citations omitted). Additionally, New Hampshire courts emphasize that:

> when a court assesses damages in an unjust enrichment case, the focus is not upon the cost to the plaintiff, but rather it is upon the value of what was actually received by the defendants. Nevertheless, in some cases it may be difficult to ascertain the value received by a defendant.... In these cases, the evidence of the plaintiff's expenditures may be considered as circumstantial evidence of the value of the benefit conferred upon a defendant.

*R. Zoppo Co., Inc. v. City of Manchester*, 122 N.H. 1109, 1113–14, 453 A.2d 1311 (1982). Here, it is readily apparent that Fairfield obtained the benefit of the Debtor's $25,000 deposit. Since the deposit was not retained by Jablecki as liquidated dam-

ages but applied to the purchase price, Fairfield, in effect, obtained the property for $275,000. The Court finds that as transferees of Fairfield, it would be unconscionable for Samian and Spruce to retain that benefit.

 Finally, there was no evidence in the record to support a finding that the Debtor's development expenditures increased the value of the Jackson property. On the contrary, it appears that additional studies and expenditures were and continue to be required to proceed with the development of the property. Accordingly, the Court is unable to find that the Trustee is entitled to a return of the development expenditures.

In view of the foregoing and the memorandum and arguments of counsel, judgment is hereby entered in favor of the Trustee and against Samian and Spruce Mountain in the amount of $25,000. So ordered.