FMA FINANCIAL CORPORATION,
d/b/a FMA Leasing Company,
Plaintiff and Appellant,

v.

PRO–PRINTERS, John Galanis, Jerry De-
Turk, John Coady, James G. Manton,
and Robert Galanis, Defendants and Re-
spondents.

No. 15595.

Supreme Court of Utah.

Jan. 15, 1979.

Milo S. Marsden, Jr., of Bradford, Marsden & Liljenquist, Salt Lake City, for plaintiff and appellant.

Roy G. Haslam, George E. Bridwell, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

This action presents a question of first impression before us, viz., whether a lease of personal property is actually a secured sale and therefore subject to the secured transactions provisions of the Uniform Commercial Code. The district court found the lease to be intended for security, and that the plaintiff failed to comply with the default provisions of Article 9 of the Code. It thus denied plaintiff any deficiency judgment, the amount of which was stipulated to be $21,975.96. We affirm. All statutory references are to Utah Code Annotated, 1953 as amended.

On June 19, 1974, defendant John Galanis sold certain printing equipment to the plaintiff, FMA Financial Corporation (hereafter "FMA"). On that same day, FMA arranged to lease the equipment back to Galanis for 60 months at $577.75 per month. The printing equipment cost FMA $21,114.53, and the lease payments totaled $34,665. FMA filed a financing statement with the Secretary of State, noting thereon that the property was being leased to Galanis.

With FMA's approval, Galanis assigned the lease to defendant Pro-Printers, Inc., on September 5, 1974. Certain officers of Pro-Printers, Inc., including Galanis and Jerry DeTurk, individually executed guaranty agreements; at FMA's request.

Pro-Printers was unable to make the lease payments for January, 1976 and thereafter. On March 19, 1976, Jerry DeTurk requested plaintiff to repossess the equipment, which it did in April. Plaintiff appraised the equipment at $10,250 on its repossession report; four months earlier, a consultant hired by Pro-Printers had appraised the equipment at between $15,000 and $17,000. The equipment was stored in a garage by Interwest Business Equipment

Company for eight months and finally purchased by Interwest for $4,500 in the fall of 1976. In addition to Interwest, two other used equipment dealers were asked by FMA to bid on the equipment in October of 1976. One of the dealers testified he offered a "ridiculously low" bid of $2,400 because he didn't want the equipment; the other dealer bid $3,000, with the intent to resell the equipment for a profit. FMA gave defendants no notice of the private sale of the equipment.

Testimony at trial indicated FMA routinely offers its lease customers an oral option to purchase the leased equipment at the end of the lease. Galanis testified he had negotiated a total of approximately $75,000 worth of leases with FMA, and with each lease he was given the option to purchase the property at the end of the lease term for a "minimal fee," usually between 10 and 15 percent of the original cost to FMA. The equipment in the case at bar was listed by FMA as having a "residual due" of $2,129, which represented the approximate purchase price to defendants at the end of the lease period. The "residual value" of the printing equipment was almost exactly 10 percent of the equipment's cost to FMA, and was approximately 6 percent of the total lease payments.

■ FMA preliminarily asserts that because the written lease agreement makes no mention of an option to purchase, and contains an "integration" clause stating that the written lease contains the entire agreement between the parties, defendants should not be allowed to vary the written terms with parol evidence of an option to purchase. However, FMA's officers admitted at trial they offered lessees the option to purchase leased equipment as a matter of course in their business; thus rendering the alleged integration clause ineffective.

FMA's first major contention is, the lease is a "true lease," and not one intended as a secured sale, as the district court found. If

FMA is correct, the provisions of Article 9 of the UCC on the disposition of repossessed collateral have no application to its actions, and it is entitled to a deficiency judgment for the stipulated amount.

■ The broad scope of Article 9 is given in 70A–9–102: "Except as otherwise provided . . ., this chapter applies (a) *to any transaction (regardless of its form) which is intended to create a security interest* in personal property . . ." (emphasis added). Therefore, if a transaction in the form of a lease is actually intended to be a sale, reserving in the "lessor" a security interest, it falls under the ambit of Article 9. 70A–1–201(37) provides in relevant part:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) *the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*

■ The question of whether a lease is intended for security has been litigated in numerous courts, and it is apparent this question must be "determined by the facts of each case"; nevertheless, if the lease is accompanied by an option to purchase, the code furnishes a "rule" which can be applied in determining the nature of the transaction. The code states that a "nominal" consideration for an option to purchase *does* make the lease one intended for security. Much of the case law on this subject understandably deals with the question of what is nominal consideration. In wrestling with this problem, courts have focused on three tests: (1) Compare the option price with the original list price or cost of the property;[1] (2) Compare the option price

1. *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166 (10th Cir. 1976); *Crest Investment Trust Inc. v. Atlantic Mobile Corp.,* 252 Md. 286, 250 A.2d 246 (1969); *In re Royer's Bakery, Inc.,* 1 UCC Rep. 342 (D.C.Pa. 1963); *In re Wheatland Electric Products Co.,* 237 F.Supp. 820 (D.C.Pa.1964); *Bell v. Itek*

with "sensible alternatives"; [2] (3) Compare the option price to the fair market value of the property at the time the option is to be exercised.[3]

Although the parties on appeal dispute which of the above tests is most often applied, and which test this Court should adopt, we note that careful review of the cases reveals many courts analyze the purchase option under all three tests. We believe it unwise to restrict our analysis of the problem to one specific test, in view of the fact that all three tests are somewhat related, and each can offer insight into the nature of the transaction which is being examined.

■ Turning to the facts before us, the option to purchase could be exercised by defendant for approximately $2,130, which is 10 percent of the original cost to FMA, and only 6 percent of the total lease payments. Most courts using this test have concluded that purchase option which is 10 percent or less of the lessor's cost is nominal.[4] In addition, such a small purchase option, when compared with the total lease payments of over $34,000, would logically leave the lessee in this case with no sensible alternative but to purchase the equipment. The testimony was undisputed that "the printing equipment had a useful economic life of at least ten to fifteen years." It is difficult to imagine the lessee would not have obtained outright ownership of the equipment for such a small sum where the equipment still had years of useful life. The third test, which compares the option price to the fair market value of the equipment at the time the option is to be exercised, is most relevant in determining whether the option price is nominal. If the price bears a resemblance to the fair market value of the equipment, the lease pay-

ments were in fact designated to be compensation for the use of the property, and the option price is not nominal.[5] Here, no testimony exists concerning the projected fair market value of the equipment at the end of the lease. Instead, the testimony believed by the district court was that the option to purchase could be exercised by the lessee for approximately 10 percent of FMA's cost, regardless of the market value of the equipment.

■ We believe, under these circumstances, the option price was nominal; according to the code, the lease is therefore intended for security and is subject to the provisions of Article 9 secured transactions.

Defendants successfully asserted below that FMA should be denied a deficiency judgment because it failed to follow the provisions of Article 9 pertaining to the disposition of collateral by the creditor after the debtor's default. 70A–9–504(3) states:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. . . . reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . .* [All emphasis supplied.]

■ In an action for a deficiency judgment such as this the secured party has the burden of establishing that the disposition of the property was done in a commercially

---

*Leasing Corp.,* 262 Ark. 22, 555 S.W.2d 1 (1977).

**2.** *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* supra note 1; *In re Alpha Creamery Co., Inc.,* 4 UCC Rep. 794 (D.C.Mich. 1967); *In Re Washington Processing Co., Inc.,* 3 UCC Rep. 475 (D.C.Cal.1966).

**3.** *In re Universal Medical Services, Inc.,* 8 UCC Rep. 614 (D.C.Pa.1970); *Peco, Inc. v. Hartbauer Tool and Die Co.,* 262 Or. 573, 500 P.2d 708 (1972); *In re Oak Manufacturing, Inc.,* 6 UCC Rep. 1273 (D.C.N.Y.1969).

**4.** See cases cited at note 1, supra.

**5.** *In re Crown Cartridge Corporation,* 220 F.Supp. 914 (D.C.N.Y.1962).

reasonable manner, and that reasonable notice to the debtor(s) was given.[6]

■ We have held that a guarantor, such as defendants Galanis and DeTurk, is a debtor under the Uniform Commercial Code, and therefore entitled to notice under 70A–9–504(3).[7] The record before us clearly indicates defendants were not given reasonable notice of the "time after which any private sale . . . [was] to be made." The only communication by FMA at all was a letter dated March 22, 1976, to Galanis advising him the equipment was going to be picked up, and that he should arrange to sell it and pay the deficiency. The defendants then orally requested FMA to pick up the equipment and sell it; but they in no way indicated a desire to waive their right to notification of the nature and time of the disposition. The purpose of the notice requirement is for the protection of the debtor, by permitting him to bid at the sale, or arrange for interested parties to bid, and to otherwise assure that the sale is conducted in a commercially reasonable manner. The danger resulting from not notifying the debtor of the sale of secured property is that the property may be sold for an amount unreasonably below its market value, burdening the debtor with liability for the deficiency. Ironically, the notice requirement acts to the secured party's advantage; if the debtor helps secure a higher sale price, the secured party is benefited, because the prospect of recovering any deficiency is usually dubious.

■ Although the Uniform Commercial Code does not expressly provide for the following remedy, many courts have held the secured party may obtain no deficiency from the debtor if it fails to give the debtor reasonable notice.[8] Other courts have held

that the debtor's exclusive remedy is set out in Article 9:

. . . If the disposition has occurred the debtor or any person entitled to notification . . . has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.[9]

While we noted the existence of the above section in *Zions First National Bank v. Hurst, supra* note 7, we do not believe it to be the debtor's exclusive remedy. In *Hurst* the notice issue was not raised at the trial level, and thus was not an intrinsic part of the holding.

■ In this case, FMA gave no notice, and we believe, did not meet the burden of proving all aspects of the sale were commercially reasonable. FMA took little or no action for six months, while the equipment sat in storage. When it finally did act, it contacted only three dealers; one had no intent to make a serious bid, and the other two bid almost as low as the first, in order to resell the equipment for a profit. In addition FMA made no attempt to advertise the equipment in local journals normally used for that purpose. FMA did not explain why the equipment was sold for less than half the amount of FMA's own appraisal just a few months before. Although "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner,"[10] the sale price obtained here, when compared with the two most recent appraisals of the equipment, leaves serious doubt that FMA used reasonable diligence in its efforts. Considering FMA's rather meager

6. *Clark Leasing Corp. v. White Sands Forest Products, Inc.*, 87 N.M. 451, 535 P.2d 1077 (1975); *First National Bank of Bellevue v. Rose*, 197 Neb. 392, 249 N.W.2d 723 (1977).

7. *Zions First National Bank v. Hurst*, Utah, 570 P.2d 1031 (1977).

8. *First National Bank and Trust Co. of Enid v. Holston*, Okl., 559 P.2d 440 (1977); *First National Bank of Bellevue v. Rose*, supra note 6;

*Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56 (1974); *Wells Fargo Bank v. Carter*, 511 F.2d 1203 (9th Cir. 1975); *Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315 (1972).

9. 70A–9–507(1).

10. 70A–9–507(2).

efforts to sell the equipment, and the low price obtained, we believe the district court correctly concluded the sale was not commercially reasonable.

Because FMA did not give the required notice, and did not conduct the sale in a commercially reasonable manner, it is barred from obtaining a deficiency judgment.

CROCKETT and WILKINS, JJ., concur.

ELLETT, C. J., dissents.

HALL, Justice (dissenting):

I do not agree that the subject lease was intended to create a security interest within the contemplation of the Uniform Commercial Code.[1]

Whether a lease is intended as security is to be determined from the facts of each case and I am of the opinion that the facts here do not warrant such a conclusion.[2]

Generally, a security interest is provided for the protection of a *seller*. In this instance, FMA is not a seller but was in fact the *purchaser* of the equipment in question from Galanis as *seller*. FMA then leased the equipment to Galanis who in turn assigned the lease to Pro-Printers, Inc., but remained jointly and severably liable with the assignee, and signed a personal, absolute and unconditional guaranty. They also waived all notice, and agreed that the equipment could be sold without impairing their liability.

What is also critical here is that, at the time of default, FMA was advised by the assignee and the guarantors to pick up the equipment and sell it. FMA gave letter notice to the guarantors of its intention to pick up the equipment and extended to *them* an opportunity to sell the equipment and thus mitigate damages. Guarantors did nothing and 11 months later FMA made the sale which is the subject of this proceeding.

The facts of this case dictate the following conclusions: (1) that *no one* intended a security interest to be reserved; (2) that guarantors were not entitled to notice of sale; and (3) in any event, they had *actual* notice of a pending sale by their own action in requesting that the equipment be *picked up and sold*.

Guarantors clearly had adequate opportunity to purchase the equipment themselves or to otherwise protect their interests in the same at the time of sale to others, had they made any effort to do so.

I would reverse and remand for the purpose of permitting judgment to be entered by way of damages as stipulated by the parties.

---

1. U.C.A., 1953, 70A–1–101, et seq.

2. U.C.A., 1953, 70A–1–201(37).