William McMAHAN and Pat McMahan,
dba McMahan and Associates,
Plaintiffs and Appellees,

v.

Richard DEES and Julie Dees,
Defendants and Appellants.

No. 910703–CA.

Court of Appeals of Utah.

April 20, 1994.

Rehearing Denied May 13, 1994.

Ralph C. Petty, Salt Lake City, for appellants.

Terry L. Christiansen, Park City, for appellees.

Before BENCH, DAVIS and GREENWOOD, JJ.

GREENWOOD, Judge:

Richard and Julie Dees appeal the trial court's decision in this breach of contract case. They assert that the trial court improperly characterized the transaction between themselves and William and Pat McMahan as a lease, awarded excessive damages, and improperly relied on *Reid v. Mutual of Omaha Insurance Co.*, 776 P.2d 896, 908 (Utah 1989), as authority to retain jurisdiction of the case. We remand to the trial court for further proceedings.

## BACKGROUND

The McMahans began a vending machine business in Park City in 1985. The business grew from just one machine in 1985 to roughly sixty machines by November 1989. Of that total number, the McMahans leased at no cost[1] ten soft drink and juice vending machines from MKM Distributing and owned the remaining vending machines. As the business grew, it required more and more of the McMahans' time.[2] In the summer and fall of 1989, the Deeses, who already owned and operated one vending route business, contacted the McMahans on three separate occasions to inquire if they were interested in selling their vending business. Responding to the first two inquiries, the McMahans stated they were not interested. However, when the Deeses inquired a third time the parties began discussions which eventually culminated in the "lease" agreement at issue here. During negotiations, the McMahans provided the Deeses with a complete list of the machines which the McMahans owned and leased, along with the estimated value of

---

1. The no cost lease arrangement with MKM Distributing gave the McMahans free use of the machines, including free service and maintenance. In return, the McMahans agreed to purchase the various juices and soft drinks for the machines from MKM Distributing. MKM Distributing offered this same arrangement to the Deeses.

2. Mr. McMahan was employed full-time as a pilot for Delta Airlines during the time that he and his wife also operated the vending business.

each machine. This list assigned a value of zero to the machines that the McMahans leased at no cost from MKM Distributing. The McMahans claim that they preferred to sell the machines outright but that the Deeses were either financially unable or unwilling to purchase the equipment on a lump sum basis. As a compromise, the McMahans agreed to lease the vending equipment to the Deeses with an option to buy when the seven-year lease expired. After completing negotiations, the parties drafted an "Agreement," designating the McMahans as lessors and the Deeses as lessees of the vending machines.

The Agreement, dated November 16, 1989, characterized the transfer of the vending equipment as a seven-year irrevocable lease requiring the Deeses to make monthly lease payments of $1250. When the parties executed the Agreement, the value of the vending machines was approximately $65,000 and the lease payments totalled $105,000. Although the Agreement gave the Deeses the option to purchase the equipment at the end of the lease period, the Agreement failed to state a purchase price. At trial, Mr. McMahan testified that the purchase price was intended to be only nominal—less than 100 dollars—so long as it conformed to IRS guidelines. Sometime after executing the Agreement, the McMahans filed a UCC–1 financing statement describing all the vending machines owned by them and transferred to the Deeses.[3] Additionally, the Agreement required the Deeses to execute a Trust Deed against two lots in Bountiful, Utah, in favor of the McMahans, as security for the lease.[4]

The Agreement contained other important provisions. The Deeses had two days from the date of execution of the Agreement to give written notice to the McMahans of any defects or objections to the vending equipment. Also, the Agreement required the Deeses to pay all license fees, assessments, and taxes on the vending equipment, as well as the cost of maintenance. In addition, the McMahans retained title to the equipment during the lease term. During the two days following the execution of the Agreement, the Deeses and Mr. McMahan visited seventeen of the twenty-three vending machine sites to verify the machines' serial numbers and to change their locks. During this process the parties discovered that the serial numbers on four vending machines were different than the serial numbers shown on the McMahans' list.[5] Thus, both sides were aware of the serial number discrepancies within two days of the execution of the Agreement. The Deeses did not, however, object in writing within two days, as required by the Agreement, demanding an adjustment in the lease term or price.

The Deeses proceeded to operate the business for about five months, until April 1990. On April 30, 1990, the Deeses' attorney informed the McMahans by letter that the Deeses were rescinding the Agreement because (1) the juice machines identified in the Agreement were not owned by the McMahans, (2) some of the vending machines' serial numbers were different than the McMahans had represented, and (3) the Deeses were never given a key to the cigarette machine at the Jeremy Ranch Golf Course.

The Deeses returned the keys to all the vending machines to the McMahans on May 8, 1990. Thereafter, to mitigate their losses and save the vending route business, the McMahans hired their neighbor, Hal Goates, to service the route at a monthly salary of $2000. The McMahans brought suit against

---

**3.** Unknown to the Deeses at the time they entered into the Agreement, the McMahans had an outstanding loan against the vending equipment with First Interstate Bank. The Bank had filed a UCC–1 financing statement in connection with this loan.

**4.** Although the Deeses executed a Trust Deed on these two lots, as requested, they failed to supply the McMahans with a legal description of the property.

**5.** The serial numbers on the vending machines play an important role in identifying the model

year and the number of items that can be placed in a particular machine. In this case, the McMahans incorrectly identified several machines as 6632 series machines when they were actually 5528 series machines. The 6632 series machines are capable of holding 32 items whereas the 5528 series machines hold 28 items. The difference in price between the two machines was not established conclusively at trial—the testimony given ranged from between 200 to 2000 dollars per machine.

the Deeses for breach of the Agreement and sought to recover their losses. The Deeses answered and counterclaimed that the McMahans had breached the Agreement and accompanying warranty of title, had misrepresented the equipment, and had retained the equipment in satisfaction of the obligation. At trial, the court ruled against the Deeses and made the following Conclusions of Law:

1. The November 16, 1989 Agreement constitutes a lease between the parties with an option to purchase being granted at the end of the seven (7) year lease period.

2. Even if the Court construed the lease as a lease with a security instrument, the Court's ruling in this case would be the same.

. . . .

5. Plaintiffs non-ownership of the soft drink and juice machines set forth on Exhibit "A" to the November 16, 1989 Agreement is not a material breach of the contract inasmuch as Defendants had continual use of the soft drink and juice vending machines and could have used the same indefinitely. Further, if and when the option was exercised, Defendants could have sued Plaintiffs for damages resulting from non-ownership of the drink machines.

6. The discrepancy in the model number for the two machines at the Yarrow Hotel and the machine at the Park City Municipal Corporation offices and at Steins does not constitute a material breach. Further, even if the discrepancy in model numbers constitute[s] a material breach, pursuant to paragraph seven (7) of the November 16, 1989 Agreement, Defendants were required to give written notice of defects or objections to the equipment within two (2) days after executing the Agreement and no written objection was given until April 30, 1990.

7. Plaintiffs did not breach the November 16, 1989 Agreement based on Defendants['] failure to obtain the keys to the cigarette machine at the Jeremy Ranch Golf Course. Even if this was construed to constitute a breach, it was not material inasmuch as Defendants could easily have obtained the keys to the cigarette machine from Plaintiffs at almost any time.

8. The fact the vending machines were encumbered with Plaintiffs' loan at First Interstate Bank is not a breach of the November 16, 1989 Agreement inasmuch as title to the machines would only become an issue if and when the option to purchase was exercised. Even if the encumbrance did constitute a breach, it would not be a material breach of the Agreement.

9. Defendants were aware either at the time the November 16, 1989 Agreement was executed or shortly thereafter that the soft drink and juice machines were not owned by Plaintiffs but were subject to a no cost lease arrangement.

The trial court awarded damages to the McMahans of unpaid lease payments from May 1990 through April 1991, plus interest, offset by the vending route's profits in January, February, and March 1991. Additionally, the McMahans received an amount representing the difference in the value of inventory and monies in the vending machines at the beginning of the Agreement and at the time of the Agreement's breach. Finally, the trial court awarded attorney fees and costs to the McMahans.

## ISSUES

The Deeses have raised four issues on appeal. The first issue is whether the trial court erred by characterizing the parties' Agreement as a lease, rather than as either a lease or a sale with retention of a security interest, thereby precluding application of the remedies under Utah's Uniform Commercial Code (UUCC). Because we remand for further proceedings on the first issue, we do not address the remaining issues. .

## STANDARD OF REVIEW

 The trial court heard this case on its merits and thereafter entered its Findings of Fact and Conclusions of Law. On appeal, we defer to the trial court's factual findings and decline to set them aside unless clearly erroneous. *State v. Pena*, 869 P.2d 932, 935 (Utah 1994). However, we grant no defer-

ence to the trial court's legal conclusions but review them for correctness. *Id.*

## ANALYSIS

### Proper Characterization of Agreement

■ The characterization of this Agreement as either a lease, a secured lease, or a secured sale seemingly controls which body of law applies, and thus the outcome.[6] The McMahans assert that Utah common law governs the issues in this case and the calculation of damages because the Deeses leased the vending equipment.[7] On the other hand, the Deeses argue that the UUCC applies because the transaction was, in their view, a sale of the vending equipment, or, at the very least a lease with a retained security interest. It is unnecessary, we believe, to decide whether the parties' Agreement was a sale or lease. The undisputed facts establish that this Agreement was a secured transaction under article 9 of the UUCC, irrespective of whether the arrangement is called a lease or a sale.

Article 9 of the UUCC states that it applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property."[8] Utah Code Ann. § 70A–9–102(1)(a) (1990). Furthermore, the general provisions of the UUCC indicate that

> [w]hether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
> . . . .

(iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Utah Code Ann. § 70A–1–201(37)(b) (1990); *see also Larson v. Overland Thrift & Loan,* 818 P.2d 1316, 1320–21 (Utah App.1991) ("lease with an option to purchase for no additional or nominal additional consideration constitutes a security agreement" under section 70A–1–201(37)(b)(iv)), *cert. denied,* 832 P.2d 476 (Utah 1992).

In the present case, the Agreement clearly meets both of the statutory requirements to be a secured transaction. First, paragraph ten of the Agreement, titled "Irrevocable Lease," states, "This Lease is irrevocable for the full term hereof and for the rentals herein reserved and the rent shall not abate by reason of termination of Lessees['] right to maintain the equipment at their present locations or any other locations utilized in the future." Second, paragraph twenty of the Agreement gives the Deeses an option to purchase the equipment at the end of the lease. Although the amount to be paid under this option was left blank, Mr. McMahan testified at trial that the amount was intended to be nominal. Accordingly, the parties' Agreement, pursuant to the statute, created a security interest for the McMahans in the vending equipment. As a result, the trial court erred in ruling that article 9 of the UUCC does not apply to this case; it does apply and controls the outcome. We therefore remand to the trial court for further proceedings consistent with our holding that the Agreement constitutes a security agreement.

On remand, the trial court should fashion a remedy consistent with the remedies provided by article 9 of the UUCC to a secured

---

**6.** The Deeses do not dispute the trial court's finding that they had no basis for rescinding the contract, thereby breaching it. Therefore, our analysis focuses solely on the proper remedy for breach of that contract.

**7.** In 1990, the Utah Legislature adopted article 2a of the Uniform Commercial Code (UCC) dealing with leases. *See* Utah Code Ann. §§ 70A–2a–101 to –533 (1990 & Supp.1993). This new

section became effective as of July 1, 1990, subsequent to this case, and is therefore inapplicable.

**8.** There are several exceptions to this general rule that are enumerated in Utah Code Ann. § 70A–9–104 (1990). The transaction in this case does not fall into any of the stated exceptions. *Id.*

party upon default of a debtor.[9] Pursuant to article 9, the secured party may either (1) reduce its claim to judgment by bringing suit on the underlying note or contract and proceed by judicial sale, (2) dispose of the collateral in a commercially reasonable manner and either obtain a deficiency judgment for the balance due or remit any surplus to the debtor,[10] or (3) retain the collateral in satisfaction of the debt.[11] Utah Code Ann.

9. The Utah Supreme Court has emphasized that "article 9 of the UCC generally seeks to establish a framework allocating rights and remedies between the parties to a security agreement aimed at effecting a balanced approach based in part upon the related standards of commercial reasonableness, good faith and reasonable care." *IFG Leasing Co. v. Gordon,* 776 P.2d 607, 611 (Utah 1989) (footnotes omitted).

10. The Utah Supreme Court noted in *IFG Leasing* that § 9–504 "allows a secured party after default to 'sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.'" *IFG Leasing,* 776 P.2d at 612 (quoting Utah Code Ann. § 70A–9–504(1) (1990)).

In construing § 9–504 to mean that merely retaining the collateral is not the same as disposing of it, the supreme court stated:

"Whatever import the modifying language 'or otherwise dispose of' is intended to have, we conclude that the mere retention of collateral is not the type of disposition which this provision contemplates. A contrary conclusion would obliterate the distinction which the Code draws between the consequences of a secured party's retaining and disposing of collateral. It would permit a secured party to dispose of collateral under § 9–504 by retaining it and in addition, to claim a deficiency. To sanction this course of conduct as 'commercially reasonable' would contravene the Code's mandate that an effective election to retain the collateral results in a complete discharge of the underlying obligation."

*Id.* (quoting *In re Copeland,* 531 F.2d 1195, 1207 (3d Cir.1976)).

11. Section 9–505(2) states that

a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. *Written notice of such proposal shall be sent to the debtor* if he has not signed after default a statement renouncing or modifying his rights under this subsection.

Utah Code Ann. § 70A–9–505(2) (1990) (emphasis added).

The Deeses admit that the McMahans did not propose in writing to retain the vending machines in full satisfaction of the debt. They do argue, however, that the McMahans' actions in retaining the collateral without disposing of it and also in using the vending machines in their ongoing vending business constitute a waiver by the McMahans of the written notice requirement and an implicit acceptance by them of the collateral in satisfaction of the Deeses' obligation.

The question of whether a secured party's actions, without written notice, can trigger the provisions of § 70A–9–505(2), thereby forcing the secured party to accept the collateral in full satisfaction of the debt, has not been fully addressed by a Utah court. In *IFG Leasing,* however, the Utah Supreme Court discussed in dicta, without adopting, three approaches from other jurisdictions. It noted that there are

"at least three different approaches to the issue of whether or not a § 9–505(2) election can be made by a creditor where the creditor has not sent the written proposal to the debtor to retain the collateral in satisfaction of the obligation. One group of courts holds that a § 9–505(2) election can be implied from an unreasonable prolonged retention of collateral. A second line of cases holds that an election under § 9–505(2) is impossible absent the service on the debtor of the statutory proposal to retain. A third position requires proof that the creditor definitely manifested an intent to accept the collateral in satisfaction of the obligation."

*IFG Leasing,* 776 P.2d at 614 (quoting *Deephouse Equip. Co. v. Knapp,* 38 B.R. 400, 403–04 (Bankr. D.Conn.1984)). Although acknowledging that a debtor might claim that the creditor's actions have effectively waived the notice requirements, the supreme court reiterated that "section 9–501 expressly states that the requirement of actual written notice under section 9–505(2) cannot be varied or waived." *Id.* Even though the supreme court did not need to resolve the § 9–505(2) issue in *IFG Leasing,* it appears to express a preference, in dicta, for the position that a creditor's actions, without proper notice to the debtor, cannot create an implied retention of the collateral in satisfaction of the debt. *Id.* at 614 & n. 32.

Contrary to this dicta, the majority view appears to be that a secured party can elect, by its actions and absent written notice, to retain collateral in satisfaction of the secured debt. *See, e.g., Lamp Fair, Inc. v. Perez–Ortiz,* 888 F.2d 173, 176 (1st Cir.1989) (stating that conscious desire to retain collateral in satisfaction of debt is unnecessary); *Banker v. Upper Valley Refrigeration Co.,* 771 F.Supp. 6, 9 (D.N.H.1991) (noting that majority of jurisdictions do not require notice and sometimes apply strict foreclosure by operation of law); *Millican v. Turner,* 503 So.2d 289, 291 (Miss.1987) (adopting "majority position" that creditor who retains collateral for unreasonably long period is deemed to have retained collateral in satisfaction of debt); *Service Chevrolet, Inc. v. Sparks,* 99 Wash.2d 199, 660 P.2d 760, 763 (1983) (embracing majority position that se-

§§ 70A–9–501, –504, –505 (1990); *see also* *Lamp Fair, Inc. v. Perez–Ortiz*, 888 F.2d 173, 175–76 (1st Cir.1989).[12]

## CONCLUSION

The Agreement between the parties in this case—whether a lease or a sale—was a secured transaction by operation of statute. Accordingly, the remedies for breach of the parties' agreement are found in UUCC article 9. We therefore remand for further proceedings consistent with this opinion.

BENCH and DAVIS, JJ., concur.

cured party who retains chattel for excessive period of time without disposing of it is not permitted to profit by failure to furnish requisite notice).

We do not decide these issues today as we remand this case for further proceedings.

12. We note that the Agreement provides three remedies on default that closely parallel the remedies of article 9 of the UUCC. The McMahans could (1) terminate the lease, (2) accelerate the remaining lease payments and declare them immediately due, or (3) repossess the vending equipment and sell it at a public sale or re-lease it to another party after which they could recover any deficiency, or remit any surplus to the Deeses, for the difference between the total unpaid amount of rentals due under the lease and the amount received on sale or re-lease of the equipment.