F I L E D
United States Court of Appeals
Tenth Circuit

FEB 26 1998

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SINE ENTERPRISES, INC., a Utah
corporation, and WESLEY SINE,

       Plaintiffs - Appellants,

v.

JAGUAR CREDIT CORPORATION, a
Delaware corporation,

       Defendant - Appellee.

No. 96-4133
(D.C. No. 94-CV-1219-C)
(C.D. Utah)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, Circuit Judge, **HOLLOWAY**, Senior Circuit Judge, and **BLACK**, District Judge. [1]

    After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]     The Honorable Bruce D. Black, United States District Judge for the District of New Mexico, sitting by designation.

argument.  See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9.  The case is therefore submitted without oral argument.

Plaintiff/Appellant Wesley Sine, a Utah attorney and president of Sine Enterprises Inc., (collectively "Sine"), claims the district court erred by granting summary judgment in favor of Jaguar Credit Corp., ("Jaguar") in a contract dispute and counterclaim for costs associated with repossession of vehicles leased by Park Place Chevrolet & Import Inc., ("Park Place") and Ken Garff Jaguar ("KG") under Utah law.  We affirm the district court's finding no agency relationship existed between Jaguar and Park Place and affirm the deficiency judgment in favor of Jaguar on its counterclaim.

## I.        Facts and Procedural History

Jaguar,  a Delaware Corporation wholly owned by Ford Motor Company,  provides automobile financing to qualified dealers.  Under two plans,  Jaguar purchases contracts from dealers at specific rates and typically is assigned the rights and liabilities under the lease.  This dispute centers on lease agreements between Sine and two dealers, which were later assigned to Jaguar or Jaguar's predecessor in interest, Jaguar Leasing Corp.

On January 8, 1992, Sine entered into a closed-end lease agreement with Park Place for a 1991 Jaguar Sovereign.  Before executing the agreement, Sine negotiated the details of delivery and price with Brad Rank, a sales person for Park Place.  In the course of these negotiations, Rank apparently represented the purchase price of the vehicle as $38,995.  However, the agreement provides a detailed breakdown of the monthly

2

payments, showing a total of $51,174, including the 60 monthly payments.  The

agreement also contains a purchase option, which allows the lessee to buy the vehicle for

$15,482 at lease end.  Despite the variance, from the prior oral representations Sine

signed as lessee on behalf of Sine Enterprises while the President of Park Place, signed as

the lessor.[2]

Sine never dealt with anyone employed by Jaguar in these negotiations.  However,

the agreement refers to Jaguar in several places.  First, Jaguar's logo and address appear

at the top of the lease.  Second, the first sentence states the lessee understands the

consumer lease disclosures made in this lease are "also made on behalf of Jaguar Leasing

Corporation to whom the lessor may assign the lease."  Then, immediately before the

signature block, the lease states execution evidences lessee and lessor accept the terms,

and that the lessor may assign all right, title, and interest to the leased vehicle to Jaguar.

Two other provisions provide in small print that Jaguar will receive a copy of the

agreement.

Other relevant lease provisions include the paragraphs identifying the parties, the
terms of assignment, the lessee's option to purchase, and the lessor's rights in the event of
 default.  The first paragraph, set off in an enclosed block, identifies the parties and states,
      "that this is a lease between the lessor and lessee(s) named in the signature
      block on the reverse side of the lease. As used in this lease the words "I,"
      "me," or "my" refer to the lessee, "you," or "your" refer to the lessor, and
      "we," "our" or "us" refer to both the lease and lessor. . ."

---

[2]     For Park Place agreement, see (Pl's App. D.1.)  For KG agreement, see
(Pl's App. D.2, and B.) Note that lease agreement figures are rounded to nearest whole
number.

Paragraph 22, immediately beneath the signature block, explains the terms for

assignment and states,

> "ASSIGNMENT: I UNDERSTAND THAT I HAVE NO RIGHT TO
> ASSIGN ANY INTEREST IN THE LEASE OR THE LEASED VEHICLE
> OR TO SUBLET OR LEND THE LEASED VEHICLE TO ANYONE
> WITHOUT YOUR WRITTEN CONSENT. I acknowledge that you or any
> subsequent assignee may assign an interest in this lease or the leased
> vehicle and that if I receive notice of an assignment, I will acknowledge the
> notice and pay any assigned amounts specified as directed.  I agree that
> unless otherwise provided by applicable law the rights of any assignee will
> be free from any claim I may have against you or any prior assignee and
> further that no assignee will be responsible for the performance of any of
> your duties under this lease unless the assignee expressly assumes the
> duties.  I also understand that upon the assignment of the lease to any
> assignee for other than collateral purposes the assignee will be entitled to all
> your rights as lessor including the rights to all payments due under the lease
> and the right to be named as the loss Payee and an Additional Insured under
> the insurance I am carrying pursuant to paragraph 4."

Paragraph 13 explains the lessee's option to purchase and states,

> "I will have the option to purchase the leased vehicle from you on an "AS
> IS, WHERE IS AND WITH ALL FAULTS" basis if this lease is not in
> default, whether I terminate the lease early as permitted in paragraph 11 or
> the lease terminates at the end of the lease term.  The purchase price will be
> the sum of the following: (a) a $100 purchase fee, plus (b) if the purchase is
> on early termination, the Initial Lease Balance described in paragraph 3 less
> all depreciation amounts previously credited or, if the purchase is at lease
> expiration, the Estimated Wholesale Value of Vehicle at Lease End shown
> in paragraph 18(b), plus (c) Any charge I may owe under paragraph 5, plus
> (d) any official fees and taxes imposed in connection with purchase of the
> leased vehicle.  I ACKNOWLEDGE THAT THIS IS A TRUE LEASE,
> THAT I HAVE ABSOLUTELY NO EQUITY OR OTHER OWNERSHIP
> RIGHTS IN THE LEASED VEHICLE OR ITS REPLACEMENT PARTS

AND THAT I CAN ONLY ACQUIRE THE LEASED VEHICLE IF I EXERCISE THE PURCHASE OPTION."

Paragraph 15 explains the terms for default and states that if the lessee fails to maintain insurance or otherwise fails to maintain his obligations under the lease, the lessor may,

> "(b) terminate the lease and my rights to possess and use the leased vehicle, (c) take possession of the leased vehicle by any method or manner permitted by law; (d) determine my termination liability on an early termination basis, and I will pay you this amount upon demand, (e) recover from me an interest rate of 18 percent per annum or lesser rate as may be provided for under applicable law on all expenses incurred by you, and on all obligations which I owe you after termination; and (f) pursue any other remedies permitted by law. I also agree in the event of default to be liable for all your collection, repossession, storage and legal costs, including your attorneys' fees and court costs, to the extent permitted by law."

After executing the agreement, Sine contacted Park Place and spoke with Brad Rank about the payment terms and delivery of the vehicle. Sine tape recorded this conversation and specifically asked Rank whether the price for the car was $38,995. Rank agreed, then informed Sine that the first month lease payment would go to Park Place, then the remaining lease payments would go Jaguar. Sometime after that conversation, Park Place assigned the lease to Jaguar Leasing Corp., the predecessor in interest of Jaguar Credit Corp.

Sine then contacted another dealer and began negotiating for a second vehicle. On March 16, 1992, he entered a second lease agreement with KG. This contract, nearly identical to the Park Place agreement, also contained the Jaguar logo and the same terms

referring to a possible assignment by the dealer/lessor to Jaguar. The KG agreement differed only by the identification of the vehicle and the lease terms, which provided $13,661 as the purchase option price of the vehicle at lease end and lease payments totaling $42,264. Sine signed this agreement as the actual lessee and a representative of KG signed as lessor. KG later assigned this agreement to Jaguar.

After receiving both vehicles and after making the first few payments on the agreements, Sine expressed concern that Rank misquoted the purchase price. Sine contacted Jaguar, who informed him it did not negotiate the terms of the leases and that only the dealer could answer these questions. A dispute ensued over the purchase price on the Park Place vehicle. Sine took the position that Jaguar should credit either his Park Place lease, the KG lease, or both accounts for the amount of Park Place's alleged misrepresentation of the purchase price on that vehicle. Jaguar refused, stating it paid for the assignment of the leases and would not recognize an alleged oral agreement contrary to those terms. Sine then stopped making payments.

Pursuant to the contract terms for default, Jaguar sought repossession of both vehicles. In November, 1992, Jaguar repossessed the vehicles. After providing Sine with notice of sale, Jaguar sold the vehicles at an auction. On January 26, 1993 Jaguar sent Sine a statement addressing the proceeds of sale. The statement detailed the costs of sale, including the expenses, balance applied to Sine's account after the sale, and transportation and repossession costs. Overall, Jaguar claimed Sine owed a deficiency of

$17,128.37, with prejudgment interest accruing from the date of default. On November 30, Jaguar sent Sine a demand letter for this amount. In December, Sine responded with this suit, a diversity action in federal court against Brad Rank, Park Place and Jaguar, alleging fraud, misrepresentation, libel and embarrassment, and that default proceedings required commercial reasonableness under Article 9 of Utah's Uniform Commercial Code ("UUCC") because the leases were actually disguised security agreements. Jaguar counterclaimed for a deficiency judgment, then filed a motion for summary judgment alleging no agency relationship existed to bind it for Rank's actions. After submitting briefs, Park Place settled, leaving the district court with the limited issue of whether Rank, as an employee of Park Place, acted as Jaguar's agent.

After oral argument on April 14, 1996, the district court granted summary judgment in favor of Jaguar, finding Sine failed to present sufficient evidence to show an issue of fact regarding Jaguar's liability for Rank's misrepresentation. Specifically, the court found Sine failed to show any actions by Jaguar which could lead him to reasonably believe Rank acted with apparent authority. After addressing Jaguar's logo on the leases, and the recorded transcript of Sine's phone conversation with Rank, the court found the evidence insufficient to show the existence of a binding agency relationship. Further, the court granted Jaguar's counterclaim for deficiency in the amount of $29,214.07, with post judgment interest accruing until judgment is paid.

7

On appeal, Sine claims the district court erred in finding no agency relationship existed between Brad Rank and Jaguar. As Sine does not question the district court's calculation of the judgment[3] and fails to substantiate his claim of libel and embarrassment, we will limit our review to three questions: (1) whether Jaguar created an agency relationship with Park Place or its salesman by providing agreements displaying the Jaguar logo; (2) whether Jaguar ratified the salesman's alleged misrepresentation of the vehicle's lease or purchase price; (3) whether the agreements were disguised security agreements requiring Jaguar to use commercially reasonable methods in disposing of the collateral.

## II.     Analysis

In reviewing a district court's grant of summary judgment, our review is de novo and we will apply the same legal standard used by the district court in evaluating the summary judgment motion, namely Fed.R.Civ.P. 56(c). City of Stillwell, Okla. v. Ozarks Rural Elec. Corp., 79 F.3d 1038 (10th Cir. 1996). Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56(c).

---

[3]     Sine limits his challenge regarding deficiency judgment to whether the lease is governed by Article 9 of the UUCC which applies "to any transaction which is intended to create a security interest in personal property." Utah Code Ann. § 70A-9-102(1)(a) (1990). On the other hand, if UUCC section 2(a), which addressees leases, controls, the deficiency judgment is justified under the contract terms and further review is unnecessary. See LMV Leasing, Inc. v. Conlin, 805 P.2d 189, 196-97 (Utah Ct. App. 1991); Utah Code Ann. § 70A-2a-101 et. seq. We address this issue in II(C) below.

8

**A. Whether Jaguar created an agency relationship with Park Place or its salesman by providing a lease agreement displaying the Jaguar logo?**

Sine's main argument is that Jaguar clothed Park Place and its salesman Brad Rank as its authorized agents by furnishing the agreement with its logo, then ratified that relationship by requiring that all negotiations be handled through Park Place. Like the district court, we find no agency relationship existed under Utah law. We also rely on precedent from other circuits recognizing a logo, in and of itself, is insufficient to establish the existence of an agency relationship.

Under Utah's law of agency, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority. See Municipal Bldg. Auth. v. Lowder, 711 P.2d 273, 279 (Utah 1985) (citing Restatement (Second) of Agency §§ 26, 27 (1958)). We agree with the district court that Sine has not provided any evidence to support either actual or apparent authority. The record lacks evidence showing that Jaguar, through conduct or assertions, authorized Park Place or its salesman, Brad Rank, to act as its agent. Likewise, the record lacks evidence showing Jaguar exerted sufficient control over the dealerships or its employees to substantiate an agency relationship. Leon v. Caterpillar Industrial, Inc., 69 F.3d 1326, 1332 (7th Cir. 1995) (citations omitted) ("the keystone of the agency relationship is the principal's ability to define and control the agent's activities"). Further, the lease terms clearly show

9

that Jaguar intended to limit its relationship to that of an assignee after the parties executed the contract.[4]

Basic agency law dictates that a principal is bound by the acts of an agent clothed with apparent authority. However, Utah adheres to the general rule that one who deals with an agent has the responsibility to ascertain the agent's authority beyond the agent's representations. Bradshaw v. McBride, 649 P.2d 74, 77 (Utah 1982) (citing Dohrmann Hotel Supply Co. v. Beau Brummel, Inc., 103 P.2d 650 (Utah 1940)). Further, an agent's apparent or ostensible authority flows only from the acts and conduct of the principal. Zions First National Bank v. Clark Clinic Corp., 762 P.2d 1090, 1094 (Utah 1988). Specifically, where corporate liability is sought for acts of its agent under apparent authority, liability is premised upon the corporation's knowledge of and acquiescence in the conduct of its agent which has led third parties to rely upon the agent's actions. City Elec. v. Dean Evans Chrysler-Plymouth, 672 P.2d 89, 90 (Utah 1983) (authority of agent

---

[4] We note that Utah law favors the assignability of contract rights, unless the assignment would add to or materially alter the obligor's duty of risk. Lone Mountain Production Co. v. Natural Gas Pipeline Co. of America, 984 F.2d 1551, 1555 (10th Cir. 1992) (citing Clark v. Shelton, 584 P.2d 875, 877 (Utah 1978)). Sine does not challenge the assignment, and we find no legal grounds to do so, especially in light of the notice provisions contained in the lease agreements. Cooper v. Holder, 440 P.2d 15, 16 (Utah 1968) (when obligor receives proper notice of assignment, he must honor it). In addition, Utah's adoption of article 2a of the Uniform Commercial Code, addressing leases, supports this body of case law as the provisions encourage the transfer of rights in a lease agreement. See Utah Code Ann. § 70A-2a-303(6) ("a transfer of the "lease" or of "all my rights under the lease" or a transfer in similar terms, is a transfer of rights . . . a delegation of duties by the transferor to the transferee.")

10

is not apparent merely because he appears so to third party; the principal must cause third parties to believe that the agent is clothed with apparent authority).

Sine attempts to circumvent these rules by claiming the logo and other language contained in his agreement with Park Place indicated he was dealing with Jaguar. Then, when he later inquired about the amount of the payments, Sine argues Jaguar ratified the agency relationship by referring him to Park Place. In the absence of other evidence of actual or implied authority, and considering the plain language expressed by the contract terms, the district court correctly considered Jaguar's logo as mere evidence of an agency relationship under the principles of apparent authority.

The existence of a logo does not, in and of itself, establish the existence of an agency relationship under the guise of apparent authority. Utah courts only recognize such evidence as a factor in establishing apparent authority. See Horrocks v. Westfalia Systemat, 892 P.2d 14,15 (agent's use of company car bearing principal's insignia not dispositive in finding apparent authority); Zions, 762 P.2d at 1095 (furnishing of rubber stamp bearing the name and address of principal, a commonplace occurrence, did not cloak the agent with apparent authority; whatever appearance of authority the stamp created arose from the actions of the agent himself and not the principal). Federal courts have also rejected the argument that an agent's use of a logo is sufficient, in itself, to establish apparent authority. See General American Life Ins. Co. v. Amsouth Bank, 100 F.3d 893, 898 (11th Cir. 1996) (stationary and business card bearing alleged principal's

11

name insufficient to support agency relationship); Leon, 69 F.3d at 1333-36 (holding dealer's use of supplier's name in advertisements insufficient to support agency relationship). Both decisions also favorably cite Malmberg v. American Honda Motor Co., 644 So. 2d 888, 891 (Ala. 1994), which held the evidence of Honda logos on a dealer's signs, literature, products, brochures and plaques was not sufficient in itself to create an inference of agency.

As it is the principal's actions which dictate the existence of agency, then, Jaguar cannot be held liable merely because Park Place used its logo. Proof that the agreement bore its logo is simply insufficient to hold Jaguar liable for the oral representation of Park Place in executing that agreement with a third party. See Leon, 69 F.3d at 1336 (minimal involvement in certain limited aspects of business insufficient to establish apparent authority); Malmberg, 644 So. 2d at 891 (substantially greater and more detailed evidence of principal's representations to customer required to establish inference of agency).

**B.      Whether Jaguar ratified the price allegedly quoted by Rank as Park Place's salesman?**

Sine also claims that Jaguar ratified his agreement with Rank, including the price he allegedly quoted. We disagree. Although a principal may either impliedly or expressly ratify an agreement made by an unauthorized agent, the key element is the principal's actual knowledge. See Bradshaw, 649 P.2d at 77 (lack of knowledge by two tenants in common precludes ratification of sale by third tenant in common). However, a

12

ratification requires the principal to have knowledge of all material facts and an intent to ratify. Id. (citing Jones v. Mutual Creamery Co., 17 P.2d 256 (Utah 1932)).

Sine offers no evidence that Jaguar had actual knowledge of a price that differed from the terms contained in the agreement assigned by Park Place. Sine's only argument is that Jaguar referred him to Park Place to clarify those terms.[5] Instead of ratification, Jaguar's response to Sine's price inquiry leads to the opposite conclusion. Jaguar simply did not have actual knowledge of all the material facts sufficient to support ratification, and certainly displayed no intent to ratify any agreement between Rank and Sine. Bradshaw, 649 P.2d at 77, City Electric, 672 P.2d at 91 (generalized statement of knowledge without further proof not sufficient to support an intent to ratify)

---

[5]As a matter unrelated to Jaguar's rights under the contract assigned by Park Place, Jaguar had no duty to verify any price orally quoted prior to execution. City Electric, 672 P.2d at 91 (citing Restatement (Second) Agency § 37(1)) (general expressions used in authorizing an agent [if such a relationship exists] are limited in application to acts done in connection with the act or business to which the authority primarily relates). Although not argued by Jaguar, Sine's ratification argument may also be foreclosed under Utah's parol evidence rule, which excludes evidence of terms in addition to those found in an integrated writing. See Colonial Leasing Co. of New England, Inc. v. Larsen Brothers Construction Co., 731 P.2d 483, 486 (Utah 1986). If Utah's statute of frauds were to apply, any modification to the price terms would also have to be in writing. See English v. Standard Optical Co., 814 P.2d 613 (Utah Ct. App. 1991) (sufficient written evidence of parties required to satisfy statute of frauds when oral agreement sought modification of rental rate). Further, under UUCC § 70A-2a-208, a signed lease agreement that excludes modification or rescission except by a signed writing may not be otherwise modified or rescinded. Utah Code Ann. § 70A-2a-208(2) (1990). Paragraph 25(d) of the contracts assigned to Jaguar contain such a provision.

13

Rejecting both arguments, we therefore affirm the finding that no agency relationship exists between Park Place or its salesman and Jaguar.

**C.     Whether the contracts were disguised security agreements requiring Jaguar to use commercially reasonable methods in disposing of the collateral?**

Sine's final argument is that the contracts with Park Place and KG were security agreements instead of leases, and Jaguar did not dispose of the collateral in a commercially reasonable manner as required under the Uniform Commercial Code. Under the provisions of UUCC §§ 70A-9-504 and 505, a creditor executing a security agreement is provided specific remedies upon default, including the option to dispose of the collateral after adhering to strict notice provisions. Utah Code Ann. §§ 70A-9-504, 70A-9-505 (1990); See IFG Leasing Co. v. Gordon, 776 P.2d 607, 610-13 (Utah 1989) (discussing creditor remedies under UUCC Article 9); McMahan v. Dees, 873 P.2d 1172, 1174-77 (Ct. App. 1994) (same). If, however, we determine the agreements are leases, then chapter 2a of the UUCC applies and the lessee is not entitled to notice of either default or of enforcement. Utah Code Ann. § 70A-2a-502.  Further, the lessor's remedies for default include those generally provided in the lease agreement.  Utah Code Ann. §§ 70A-2a-501(2), 70A-2a-523.

The district court determined Jaguar's remedies for default were defined under the terms of the "lease agreement."  We affirm, holding the contracts are indeed lease agreements and the provisions of Article 9 of the UUCC regarding disposition of

repossessed collateral have no application, thus Jaguar is entitled to the deficiency judgment.

> The Utah courts have recognized that

> [whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and:

> . . .

> (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with he lease agreement.

McMahan, 873 P.2d at 1175 (citing Utah Code Ann. § 70A-1-201(37)(b) (1990)); Larsen v. Overland Thrift & Loan, 818 P.2d 1316, 1320-21 (Utah Ct. App. 1991) ("lease with an option to purchase for no additional or nominal additional consideration constitutes a security agreement under 70A-1-201(37)(b)(iv)").

If the lease in question is accompanied by an option to purchase, Article 9 provides the Rosetta Stone for determining the nature of the transaction. FMA Financial Corp. v. Pro-Printers, 590 P.2d 803, 805-6 (Utah 1979). Mere inclusion of an option does not necessarily constitute a security agreement; the option must be for no, or only nominal, additional consideration in which case it is presumed to be a security agreement. LMV Leasing, Inc. v. Conlin, 805 P.2d 189, 195 (Utah Ct. App. 1991). In wrestling with what is considered nominal, Utah courts have used three different tests: (1) Compare the option

15

price with the original list price or cost of property; (2) Compare the option price with sensible alternatives; (3) Compare the option price to the fair market value of the property at the time the option is to be exercised. The application of two of these tests in Pro-Printers, 590 P.2d at 806, is illustrative. Applying the first test provided a general rule that if the option price is less than 10 percent of the original cost to the lessor, the leased item is collateral for a security agreement. Id. (citing cases). Under the second test, the court reasoned that if an option price is small, and the property has several years of useful life remaining, a reasonable lessee will have no choice but to purchase. Id. [6]

Turning to the facts before us, the agreement between Park Place and Sine provided a purchase option price of $15,482 after Sine paid $51,174 over 60 months. Park Place apparently purchased the vehicle for $40,102, based on an invoice contained in the record.[7] As a result, Sine's option price is over 30 percent of his total lease payments, and 38 percent of the original cost to Park Place. We also know that the agreement between

---

[6]      In Pro-Printers, the dispute centered on whether a piece of printing equipment was collateral. Pro-Printers, after assignment of the lease, defaulted and FMA, as lessor, received a deficiency judgment under the lease terms. The printing equipment cost FMA $21,114.53, and the assigned lease payments were $577.75 a month for 60 months, or $34,665. The court looked to the residuary due at the end of the lease, $2,129, and cited this amount as the approximate purchase price at the end of the option. The "residual value" of the printing equipment was almost exactly 10 percent of the original cost to FMA, and was approximately 6 percent of the total lease payments. Based on these figures, the court determined the option price was nominal, and the lease was actually a security agreement. Id., at 805-7.

[7]      See (Pl's index, App. 7.) The invoice identifies the vehicle by serial number and provides an invoice price of $40,102 and a retail price of $48,380. We will use the lower figure in our analysis.

KG and Sine provided similar figures regarding an option to purchase. For example, Sine's option price on the KG lease is 32 percent of his total lease payments. Under the tests applied by the court in Pro-Printers, Sine's option to purchase price is clearly not nominal under either lease.  We conclude the two agreements are leases rather than security agreements.[8] We therefore affirm the deficiency judgment.

AFFIRMED.

ENTERED FOR THE COURT

Bruce D. Black
District Judge

---

[8]     Because we conclude both agreements are true leases, we need not address Sine's claim that repossession occurred without proper notice or in a commercially reasonable manner under UUCC Article 9.  As noted *supra*, the vehicles were repossessed in accordance with the lease terms and the subsequent deficiency judgment rendered accordingly. Larsen, 818 P.2d at 1320-21.